**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

MUSTANG MARKETING, INC., a
California corporation,
            *Plaintiff-Appellant,*

v.

CHEVRON PRODUCTS COMPANY, a
division of CHEVRON U.S.A. INC., a
California corporation; and
CHEVRON TEXACO CORPORATION,
            *Defendants-Appellees.*

No. 03-56516

D.C. No.
CV-02-00485-DOC

OPINION

Appeal from the United States District Court
for the Central District of California
David O. Carter, District Judge, Presiding

Argued and Submitted
February 18, 2005—Pasadena, California

Filed April 29, 2005

Before: A. Wallace Tashima, Kim McLane Wardlaw,
Circuit Judges, and Raner C. Collins,* District Judge.

Opinion by Judge Collins

---

*The Honorable Raner C. Collins, United States District Judge for the
District of Arizona, sitting by designation.

**COUNSEL**

Stephen Thomas Erb, Esq., San Diego, California, for the plaintiff-appellant.

Michael L. Armstrong, Esq., Morgan, Lewis & Bockius LLP, Los Angeles, California, for the defendants-appellees.

**OPINION**

COLLINS, District Judge:

Mustang Marketing, Inc. ("Mustang") brought this suit against Chevron Products Company ("Chevron") alleging a violation of the Petroleum Marketing Practices Act ("PMPA"), 15 U.S.C. § 2801 et seq., with respect to a gas station (the "Service Station") that Chevron had leased from Macerich and then franchised to Mustang. Mustang alleges that Chevron failed to comply with a provision of the PMPA requiring Chevron to assign to Mustang any option it possessed for an extension of the underlying lease after the underlying lease had expired. Additionally, Mustang alleges that Chevron violated the PMPA by entering into a subsequent lease with Macerich after ending Mustang's franchise through expiration of the original underlying lease and lock Mustang out of the deal.

The district court granted summary judgment in favor of Chevron on all counts. Mustang brings this appeal on the questions of: (1) Whether Chevron relying upon PMPA § 2802(c)(4) can refuse to assign Mustang the option to extend the underlying lease; (2) Whether Chevron may end its franchise relationship with Mustang based upon expiration of its underlying lease with Macerich and subsequently negotiate a new underlying lease with Macerich and locking Mustang out of the deal; (3) Whether, if any of these allegations are true, any exemplary damages may be awarded to Mustang; (4) Whether the proposal sent by Chevron to Mustang in April constitutes a breach of contract in California; and (5) Whether this case, if remanded, should be reassigned to a different district judge?

## I.   BACKGROUND

On April 28, 1971, Chevron's predecessor in interest, Standard Oil Company of California, entered into the underlying

lease (Ground Lease) for the Service Station for a term expiring May 31, 1992, with two options to extend with Macerich's predecessor in interest. Chevron then took over the lease and exercised the five-year and four-year options extending its tenancy through May 31, 2001. Meanwhile, Macerich succeeded to the lessor's interest under the underlying lease. Throughout the entire term of the underlying lease, Chevron subleased the premises to independent service station operators licensed to sell Chevron-branded motor fuel.

The underlying lease granted Chevron, as lessee, the following right for extending its tenancy:

> 7.   Lessee, while in possession, shall have the prior right to lease the whole or any part of the leased premises or any larger parcel which includes the leased premises, if Lessor receives from a third party an acceptable bona fide offer, or if Lessor offers, to lease such property for a term commencing on or after the expiration of the term hereof or any extension thereof . . .

Taking language from Section 7 itself, therefore, Mustang refers to this right as the "Prior Right to Lease."[1] Chevron says that this section merely gave Chevron the right to match: (1) an offer for a new underlying lease received by Macerich; (2) during Chevron's tenancy; (3) that Macerich wanted to accept.

In December 1998, Mustang purchased the previous franchisee's equipment, goodwill, and PMPA franchise rights. Although aware that the underlying lease expired on May 31, 2001, Mustang's principal, Robert Lintz ("Lintz"), correctly

---

[1]Chevron disputes this title, preferring to call it instead a "Right of First Refusal," saying Mustang is using the name for tactical purposes; however, there is nothing wrong with "Prior Right to Lease" as the phrase comes directly from the section.

predicted that Chevron would be very interested in extending its underlying tenancy.[2] However, even if Chevron elected to depart, Lintz assumed Mustang would be well-positioned to obtain its own direct lease from Macerich.

Approximately one year before the underlying lease expired, Chevron evaluated the Service Station. Chevron concluded that the Service Station's location was attractive but that the Service Station itself (particularly the service bays) no longer met Chevron's image requirements. Based on this conclusion, Chevron decided that it would attempt to keep its brand at the site, but only if the Service Station could be demolished and rebuilt with modern improvements.

Chevron says that its evaluation meant that the Service Station could no longer be operated as a dealer-leased site. Chevron states that the significant costs of constructing a new station (estimated at $1,300,000) mandated that the Service Station be converted either to a company-owned site or a dealer-owned site (depending on who financed the improvements). However, there was uncertainty as to the outcome since everything depended on Macerich's approval of a new lease.

On April 18, 2000, Mustang's franchise agreements were renewed through May 31, 2001.[3]

In March 2000, Chevron Property Specialist Jeffery Cole ("Cole") wrote to Mary Klein-Paquin ("Paquin") at Macerich stating that Chevron "clearly prefers" to obtain a long-term lease for the Service Station property upon expiration of Chevron's current underlying lease. Meanwhile, Chevron's Retail Account Manager Julie Humphreys ("Humphreys")

---

[2]Lintz was a former employee of Chevron and therefore familiar with the PMPA and its requirements.

[3]The original Dealer Agreement expired on that date, but was renewed to coincide with the expiration of Chevron's underlying lease.

and her supervisor, Scott Lystad, approached Lintz with an offer to buy Mustang's Service Station interests for $750,000. Mustang did not wish to sell especially at the price Chevron offered. Lintz proposed a price of $775,000, but only on the condition that Chevron agree to sell to Mustang Chevron's interest in two other service stations.

Humphreys wrote to Lintz on May 8, 2000, setting forth Chevron's proposal to pay $775,000. In the preamble to the Chevron-provided letter was the following statement:

> This letter sets forth only a proposal for your consideration. Neither you nor Chevron will be bound or have any obligations with respect to this proposal unless and until the following conditions have been satisfied.

The sale would be subject to four conditions: (1) Chevron's ability to secure extended tenancy from Macerich beyond May 31, 2001; (2) Chevron's ability to obtain permits to remodel the facility; (3) approval by Chevron's management; and (4) the parties' execution of an "Agreement for Mutual Termination of Dealer Lease," substantially in a form purportedly attached to the May 8th letter.

Humphreys' letter also did not mention the two service stations Lintz desired to purchase from Chevron. Lintz therefore handwrote those additional terms on Humphreys' letter, signed in Chevron's signature block: "ACCEPTED AND AGREED TO," and returned the letter to Humphreys. Humphreys telephoned Lintz to explain that she could not add language to Chevron's letter, then wrote "Void due to Bob putting conditions" on her file copy.

At around the same time Chevron and Mustang attempted to negotiate a new lease with Macerich. Given the significant investment required to rebuild the Service Station, Chevron says that both it and Mustang insisted that Macerich agree to

an initial lease term of at least twenty years. However, Macerich refused to accept such a lengthy term and insisted on a term of five years (according to Chevron). Chevron also states that the rent that Macerich was seeking was unacceptable.

Chevron made a second written offer to Mustang for $775,000 on June 22, 2000. Mustang still did not wish to sell. On February 21, 2001, Chevron employees Cole, Humphreys and Michael O'Neal ("O'Neal"), told Lintz in a meeting at Chevron's offices that if Mustang was not willing to sell its Service Station interests to Chevron, then Chevron would not extend its underlying lease. Lintz protested Chevron's negotiating tactics and insisted the business was worth more than $775,000.

Apparently all the parties were also aware that Macerich wanted to convert the property to a fast-food restaurant as soon as Chevron's underlying lease expired.

Chevron then hand-delivered to Lintz its February 21, 2001, written notice of non-renewal of the franchise relationship ("Non-renewal Notice"), relying solely upon expiration of Chevron's underlying lease on May 31, 2001. Mustang claims that Chevron never offered to assign to Mustang the Prior Right to Lease as required by § 2802(c)(4)(B) of the PMPA. Both orally and in letters dated February 22, March 5, and June 4, 2001, Lintz insisted that the PMPA required Chevron assign to Mustang its Prior Right to Lease, which Chevron refused to do. With the Non-renewal Notice now pending, on March 2, 2001, Chevron offered to pay Mustang $700,000 for its Service Station interests.

In letters dated March 2, April 3, and April 26, 2001, Chevron told Lintz that Chevron would not renew its underlying lease with Macerich unless and until Chevron had reached a "mutually satisfactory agreement" for the purchase of Mus-

tang's interests. On April 16, 2001, Chevron offered Mustang $775,000. On April 23, 2001, Chevron offered $850,000.

Unknown to Lintz, Macerich was finding that Chevron's intent to exercise the Prior Right to Lease was dissuading all other prospective tenants from offering to lease the Service Station property. In fact, aside from offers by Mustang and Chevron, Macerich received no other offers.

During March through May 1, 2001, Chevron and Macerich exchanged written lease proposals. In each proposal, Chevron requested an initial base term of only two years, to be followed by multiple five-year options exercisable in Chevron's discretion. Macerich's Mark Strain ("Strain") testified that such short initial base terms were generally unacceptable to Macerich, as were multiple options to extend. For its part, Chevron states that Macerich made unreasonable offers with a lease term of only five years. Nonetheless, Paquin was optimistic Macerich would eventually reach agreement with Chevron, and she attached no importance to doing so prior to May 31, 2001.

On May 1, 2001, Chevron's Cole reportedly went to Macerich's offices to meet personally with Strain and Paquin. Cole testified the meeting was "very contentious," and he left believing Macerich did not want Chevron as a tenant. Neither Cole nor anyone else at Chevron pursued negotiations with Macerich between May 1 and mid-June, 2001. At the same time, some negotiations between Macerich and Mustang did take place which proved unproductive.

Mustang states that Paquin contradicted Cole's account of this meeting in several material respects. Paquin testified that the meeting was not the least bit contentious. According to Paquin, negotiations were proceeding normally. In mid-May 2001, Paquin unexpectedly required a maternity-related medical leave of absence.

O'Neal advised Lintz in early May, 2001, that Chevron had discontinued its negotiations with Macerich. Mustang was free to negotiate its own lease he said, though O'Neal cautioned Lintz against paying Macerich too much for rent. Unknown to Lintz, Chevron's in-house attorney, Paula Bailey, wrote to Macerich on May 3, 2001, insisting that Chevron receive notice of all offers made to lease the property. Cole testified that Chevron fully intended to assert the Prior Right to Lease against offers made to or by Mustang.

Chevron represented in the district court that by early May 2001, it had given up hope of obtaining a new lease from Macerich. Chevron then reportedly "wrote off" its Service Station assets, weeks before its underlying lease was to expire, and "began the process of pulling permits" to demolish its improvements. However, on May 14, 2001, Humphreys frankly told Lintz that Chevron was not pursuing any "hard negotiations" with Macerich because Mustang had not yet agreed to sell its Service Station interests.

Chevron's April 23, 2001, offer for $850,000 remained outstanding. At Humphreys' urging, Lintz reluctantly signed the letter on May 22, 2001, thus forming the Letter Agreement. Chevron states that by the time Mustang agreed to this offer, negotiations for a new lease between Chevron and Macerich had been broken off so this offer was never submitted to Chevron's management for consideration because the conditions were not satisfied.

Throughout June and July 2001, Chevron took no action to actually remove its Service Station improvements. No other tenant ever took possession. When Mustang inquired about purchasing Chevron's improvements in June 2001, Chevron disavowed any duty to sell, whether or not Mustang successfully obtained its own direct lease for the property. For its part, Chevron states that the Prior Right to Lease was not relevant since it expired with the Ground Lease.

The next month, Chevron began to change the terms in its conditions for the new underlying lease. Learning of Chevron's progress, Lintz asked O'Neal on July 6, 2001, to confirm their arrangement under the Letter Agreement, while he also offered not to compete against Chevron for the Macerich lease.

By letter dated July 31, 2001, Richard Loyd at Chevron confirmed all of the essential terms of Chevron's new 20-year lease with Macerich. On August 10, 2001, O'Neal finally responded to Lintz in writing, confirming that Chevron had reached a tentative agreement on a new lease with Macerich, and saying that the April 23, 2000 letter was merely a proposal.

Chevron signed a new 20-year lease for the Service Station premises on May 1, 2002 and reopened the Service Station as a Chevron-operated facility on May 28, 2002.

Chevron also paid Macerich $129,000 as a "lease inducement fee" for "environmental liabilities." However, Chevron has admitted that the payment was for back rent to June 2001. Macerich's accounting records corroborated this fact. On February 18, 2003, Chevron obtained City of Santa Ana approvals to renovate the Service Station and to build a new convenience store.

For its part, Chevron claims that in late June 2001, Macerich "dramatically altered its negotiating position" because Macerich was now prepared to accept a long term rent at a rate much closer to Chevron's figures. Chevron then says that "without telling Chevron or Mustang about its change in position, Macerich invited Chevron to renew its efforts to negotiate a new lease" while simultaneously negotiating with Mustang. Macerich then selected Chevron. Chevron then states that it took nine months to finalize the deal and finally, on May 1, 2002, a new Ground Lease was executed.

As of June, 2003, no renovations had been made to Mustang's former Service Station. Chevron now operates the facility exclusively for its own account. Judgment was first entered on July 30, 2003. On Chevron's motion, the original judgment was vacated as incomplete and an Amended Judgment was entered August 14, 2003. This appeal followed.

## II.   DISCUSSION

### 1.   Standard of Review

We review *de novo* the grant of summary judgment. *See Oregon Paralyzed Veterans of America v. Regal Cinemas, Inc.*, 339 F.3d 1126, 1130 (9th Cir. 2003); *Rene v. MGM Grand Hotel, Inc.*, 305 F.3d 1061, 1064 (9th Cir. 2002) (en banc). Our review is not limited to a consideration of the grounds upon which the district court decided the issues; the Court can affirm the district court on any grounds supported by the record. *Sicor Ltd. v. Cetus Corp.*, 51 F.3d 848, 860 fn. 17 (9th Cir. 1995). We must determine whether the record, when viewed in the light most favorable to Mustang, shows that there is no genuine issue of material fact and that Chevron is entitled to summary judgment as a matter of law. *See, e.g.*, *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed. 2d 265 (1986).

The interpretation of a statute is a question of law which we review *de novo*. *See, e.g.*, *Carson Harbor Village, Ltd. v. Unocal Corp.*, 270 F.3d 863, 870 (9th Cir. 2001); *Hilo v. Exxon Corp.*, 997 F.2d 641, 643 (9th Cir. 1993) (PMPA). The grant of summary judgment on grounds that a signed writing is not an enforceable contract is also reviewed *de novo*. *Rennick v. O.P.T.I.O.N., Care, Inc.*, 77 F.3d 309, 313 (9th Cir. 1996).

### 2.   *Chevron's Option of the Prior Right to Lease and PMPA § 2802(c)(4)(B)*

Mustang claims that it was never offered the Prior Right to Lease option by Chevron as was required by the PMPA.

Chevron claims that it did in fact make the offer to Mustang and that regardless, the offer was not required since the option expired with the termination of the underlying lease with Macerich.

**[1]** A franchisor invoking § 2802(c)(4) as grounds for non-renewal or termination must offer to assign to its franchisee "any option to extend the underlying lease" which the franchisor holds. The offer to assign is a condition to the very validity of the Non-renewal Notice. 15 U.S.C. § 2802(c)(4)(B).

We have observed that " '[a]s remedial legislation, the [PMPA] must be given a liberal construction consistent with its goal of protecting franchisees.' " *Hilo*, 997 F.2d at 643 (citing *Humboldt Oil Co. v. Exxon Co., U.S.A.*, 695 F.2d 386, 389 (9th Cir. 1982)). Prompted by reports of unfair and coercive practices by major oil companies, Congress provided protections where franchisees were most vulnerable, viz., against the actual or threatened loss of their businesses. As such, the "overriding purpose of Title I of the PMPA is to protect the franchisee's reasonable expectation of continuing the franchise relationship." *Unocal Corp. v. Kaabipour*, 177 F.3d 755, 762 (9th Cir. 1999).

With this general principle of the PMPA serving as the background, statements by Representative Wyden explain the purposes of § 2802(c)(4)(B) as follows:

> Another problem arises in situations where the service station operators are not parties to the lease agreements for the properties where their stations are located. Some oil companies are taking advantage of this, and, by refusing to renew the lease for the property, are forcing dealers to be evicted.
>
> Second, H.R. 1520 addresses situations where the franchisor leases the service station property from a third party and the station operator is not a party to

the lease. In these circumstances, the station operator typically has no right to extend the lease or to purchase the property from the landlord; the franchisor has the sole right to exercise any options to renew the lease or buy the service station. As a result, franchisors can in effect terminate their franchisees and put the station operators out of business simply by failing to exercise these options.

To protect dealers against terminations in these situations, franchisors will now be required to give their franchisees the opportunity to assume the underlying leases for the station properties when those leases expire. Oil companies, which are typically the parties to the lease agreements, will now be required to offer to assign to the service station operators any options they hold either to purchase the property or to extend the lease.

140 Cong.Rec. 27316, 27317-18 (1994) (remarks by Rep. Wyden).

This case is the very situation which the creators of this provision of the PMPA sought to remedy. Representative Wyden's remarks make it very clear that Congress intended to remedy situations where the franchisor, using its superior bargaining position and strength, could evict the operator by claiming non-renewal of the underlying lease but continuing to hold onto any options it possesses to extend the lease. This appears to be exactly what happened with respect to Mustang.

Section 2802(c)(4)(B) of the PMPA requires the franchisor to offer the franchisee "any option to extend the underlying lease." *See* § 2802(c)(4)(B). If Chevron possessed any option to extend the lease, then by law, it was required to offer that option to Mustang upon expiration of the lease. The issue becomes whether Chevron possessed a valid option?

As the record shows, Chevron possessed an option referred to as the Prior Right to Lease contained in Section 7 of its underlying lease with Macerich. Chevron argues that this option was only exercisable in very limited circumstances, namely that it merely possessed the right to match a third party offer and that, in any event, the option expired with the termination of the underlying lease.

**[2]** While Section 7 is not a unilateral option to extend as were Chevron's other two options, it does give Chevron the "prior right to lease" if a third party offers or if "Lessor [Macerich] offers." Hence, this was a bilateral option to extend and did not expire as Chevron had claimed.

This fact is further supported by the record where Chevron informed prospective third parties that it possessed this Prior Right to Lease and intended to exercise it if anyone should make an offer. This clearly shows that Chevron thought it still possessed the option and intended to use it.

The record is unclear as to whether Chevron ever offered this option to Mustang. Chevron claimed that it did, Mustang claimed that it did not.[4] We remand that issue for the trial court to determine. What is determinable, however, is that Chevron possessed a duty to extend its option to Mustang if the underlying lease had expired. We turn to the question of the lease expiration next.

*3.   Chevron's Use of the Expiration of the Underlying Lease to Evict Mustang*

**[3]** Under § 2802(c)(4) of the PMPA, the termination of the underlying lease is an acceptable reason for the termination of the franchise relationship.[5] While it appears that facially

---

[4]Curiously, the citation that Chevron points to in the record for its contention is "*see*, supra, pp x-x."

[5]Section 2802(c)(4) says that the "loss of the franchisor's right to grant possession of the leased marketing premises through expiration of an underlying lease" is an acceptable reason for termination assuming certain notification requirements are met.

Chevron complied with this statute with the expiration of the original underlying lease, its subsequent actions call into question whether this is what really occurred.

**[4]** The "overriding purposes of Title I of the PMPA is to protect the franchisee's reasonable expectation of continuing the franchise relationship." *Ellis*, 969 F.2d at 788 (quoting *Slatky v. Amoco Oil Co.*, 830 F.2d 476, 484 (3rd Cir. 1987)). Expiration of the underlying lease is not to be interpreted literally. *Veracka v. Shell Oil Co.*, 655 F.2d 445, 448 (1st Cir. 1981). Courts have scrutinized the franchisor's subjective intent, its continuing control over the marketing premises, and its actual or eventual right to continued possession. *See Hifai v. Shell Oil Co.,* 704 F.2d 1425, 1429 (9th Cir. 1983) (inquiring into and finding that the franchisor had a sincere intent to discontinue its use of the premises as a service station); *Veracka,* 655 F.2d at 448 (holding that "expiration" is not to be taken literally, then inquiring into and finding that the franchisor had experienced total loss of control over the marketing premises).

The statutory phrase "loss of franchisor's right to grant possession of the leased marketing premises through expiration of an underlying lease" must be interpreted as an unified whole as well as in context of the overall legislative scheme. *Kaabipour*, 177 F.3d at 770-71.

The Senate Report accompanying the original 1978 legislation provides in pertinent part:

> However, it is not intended that termination or non-renewal should be permitted based upon the expiration of a lease which does not evidence the existence of an arms length relationship between the parties and as a result of the expiration of which no substantive change in control of the premises results.

S.Rep. No. 95-731, 95th Cong., 2d Sess. 38, *reprinted in* 1978 U.S. Code Cong. & Ad. News 873, 896.

In *Hifai*, we reviewed § 2802(c)(4) in light of its legislative history and concluded:

> This quotation [from Senate Report No. 95-731] merely evidences an intent underlying the PMPA not to permit a franchisor to use section 2802(c)(4) as a means to end a franchise relationship with one operator while retaining control of the premises. No such situation is present in this case. Throughout, Shell has acted in a manner which indicated a sincere intent to dispose of the premises and discontinue its use of the premises as a service station.

704 F.2d at 1429. In *Hifai*, we held that "the purpose of the extension was not to grant possession to another subtenant, but to give Shell [the franchisor] time to regain possession from Hifai [Appellant]. The record contains no evidence that Shell ever had any other intention than to terminate the master lease . . ." *Hifai*, 704 F.2d at 1429.[6] We emphasized the "purpose" of the extension and to look at what the franchisor intended to do with the premises.

**[5]** Under the *Hifai* analysis, we examine Chevron's intent. Viewing the record in the light most favorable to Mustang, as we must, Chevron never intended to vacate the premises even after its initial failure to negotiate a lease extension with Macerich. In March 2000, Chevron wrote to Macerich stating that Chevron "clearly prefers" a long-term lease agreement. The letters dated March 2, April 3, and April 26, 2001, in which Chevron plainly told Mustang that it would not renew

---

[6]In *Hifai*, we ruled that the oil company, which informed its franchisee that the franchise would be terminated because the oil company was not renewing the underlying lease gave adequate reason for termination, even though the oil company's control over the premises was extended at the end of the term of the master lease so that the oil company could evict the service station operator, which it was required to do in order to exercise its right to remove the improvements from the premises. *Hifai*, 704 F.2d at 1430.

its underlying lease unless Mustang sold to Chevron all of its interests in the Service Station demonstrate Chevron's intent to stay at the Service Station, and are violations of the PMPA. Likewise, Chevron let it be known that it intended to exercise its Prior Right to Lease which dissuaded any other prospective third parties interested in the premises. Additionally, on May 3, 2001, Chevron's counsel wrote a letter to Macerich and insisted that Chevron receive notice of all offers made to lease the property. Also, the fact that even after their original underlying lease terminated Chevron never took any substantial physical steps to remove its improvements, demonstrate that it never intended to leave the site.[7] Finally, after Chevron and Macerich had agreed to another underlying lease where Chevron opened the Service Station run by its own employees, Chevron paid Macerich a $129,000 "lease inducement fee" that was later discovered to be back rent.

[6] All of these actions point to the fact that Chevron never intended to leave the premises. This is manifestly different from *Hifai* where the franchisor's lease was extended merely to evict the operator. Again viewing the evidence in the light most favorable to Mustang, we conclude that Chevron always intended to remain at the Service Station. In order facially to comply with the PMPA, Chevron attempted to maneuver through this law by ending Mustang's franchise by the termination of the underlying lease while holding onto the Prior Right to Termination so as to be able to keep its grip on the Service Station premises, and by then going through protracted negotiations of nine months with Macerich and finally placating Macerich with the $129,000 payment. Chevron then could point to the fact that nine months had elapsed between the expiration of the original lease and the commencement of the new lease and say that it was merely exercising its right in the market place to do business where it pleased.

---

[7]Chevron contends that it undertook concrete steps to begin removing the repairs like applying for permits but the fact remains that months after the expiration of the lease, the improvements remained on the premises.

**[7]** These actions by Chevron are exactly what Congress intended to prohibit with its enactment of the PMPA. Therefore, the district court's grant of summary judgment in favor of Chevron is reversed and remanded.

## 4. Exemplary Damages

**[8]** Section 2805(d) provides for "actual and exemplary damages" to the franchisee if the court finds that the franchisor has violated §§ 2802 or 2803 of the PMPA.

In common usage, the word "willful" is considered synonymous with such words as "voluntary," "deliberate," and "intentional." In the context of the PMPA it is reasonable to use the term "willful" to indicate an act that is not merely negligent but can be said to have taken with deliberate or intentional disregard to the requirements of the statute. *Id.* The phrase "willful disregard" has been defined to mean that a franchisor "either knew its conduct was prohibited by the PMPA or if the franchisor acted with plain indifference to its prohibitions." *Eden v. Amoco Oil Co.*, 741 F.Supp. 1192, 1195 (D.Md. 1990). When the courts have considered the term "willful disregard" with respect to the PMPA, they have been reticent to award exemplary damages absent a clear and affirmative showing of a deliberate and intentional act on the part of the defendant.

**[9]** Because there are controverted issues of fact on whether Chevron's actions were in willful disregard of the PMPA, this issue is remanded back to the district court.

## 5. The Proposal Letter of April 23rd

As a fall back position to its PMPA arguments, Mustang alleges that the April 23rd letter constituted a binding contract on Chevron. Because we conclude that summary judgment on the question of Chevron's violation of the PMPA must be reversed, we decline to address this issue.

*6.   Remand Back to a Different District Judge*

Mustang requests that if this case is remanded, that it be reassigned to a different district court judge.

In *Air-Sea Forwarders, Inc. v. Air Asia Co., Ltd.*, 880 F.2d 176, 191 (9th Cir. 1989), we stated that 28 U.S.C. § 2106 has conferred the power on us to reassign cases when they are remanded. However, that authority is exercised in only "rare and extraordinary circumstances." *Id.*

In deciding whether reassignment is appropriate, two inquiries are made. The first question is whether the district court has exhibited personal bias requiring recusal from a case. *United States v. Sears, Roebuck & Co.*, 785 F.2d 777, 779-80 (9th Cir. 1986). Absent a showing of personal bias, the Court must decide whether "unusual circumstances" warrant reassignment. *Id.* at 780. The factors for determining "unusual circumstances" are:

> (1) whether the original judge would reasonably be expected upon remand to have substantial difficulty in putting out of his or her mind previously expressed views or findings determined to be erroneous or based on evidence that must be rejected; (2) whether reassignment is advisable to preserve the appearance of justice; and (3) whether reassignment would entail waste and duplication out of proportion to any gain in preserving the appearance of fairness.

*United Nat'l Ins. Co. v. R & D Latex*, 242 F. 3d 1102, 1118-1120 (9th Cir. 2001).

**[10]** Mustang has not shown any personal bias on the part of the district judge nor has it proven its burden of demonstrating the fulfillment of the several factors to show that "unusual circumstances" are present in this case. Therefore, the Court declines to remand back to a different district judge.

**REVERSED and REMANDED**