# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

---

BERTRAM SACKS,
         *Plaintiff-Appellant,*

    v.

OFFICE OF FOREIGN ASSETS
CONTROL, United States
Department of the Treasury;
RICHARD NEWCOMB, Director,
Office of Foreign Assets Control,
         *Defendants-Appellees.*

No. 04-36136

D.C. No.
CV-04-00108-JLR

---

BERTRAM SACKS,
         *Plaintiff-Appellee,*

    v.

OFFICE OF FOREIGN ASSETS
CONTROL, United States
Department of the Treasury;
RICHARD NEWCOMB, Director,
Office of Foreign Assets Control,
         *Defendants-Appellants.*

No. 05-35001

D.C. No.
CV-04-00108-JLR

OPINION

---

Appeal from the United States District Court
for the Western District of Washington
James L. Robart, District Judge, Presiding

Argued and Submitted
July 24, 2006—Seattle, Washington

Filed October 10, 2006

Before: J. Clifford Wallace, Kim McLane Wardlaw, and
Raymond C. Fisher, Circuit Judges.

17319

Opinion by Judge Wardlaw

**COUNSEL**

Donald B. Scaramastra (argued) and Gary D. Swearingen, Garvey Schubert Barer, Seattle, Washington, for appellant/cross-appellee Bertram Sacks.

H. Thomas Byron III (argued) and Douglas Letter, Department of Justice, Washington, DC, for appellees/cross-appellants Office of Foreign Assets Control.

Kenneth S. Kagan, Carney Badley Spellman, P.S., Seattle, Washington, for amicus curiae Washington Physicians for Social Responsibility.

---

## OPINION

WARDLAW, Circuit Judge:

These consolidated cross-appeals arise from a challenge to the pre-2003 United States sanctions prohibiting both travel to and the unlicensed donation of humanitarian medical supplies to Iraq. We affirm the district court's decision that Bertram Sacks has standing to challenge the ban on travel and that the travel ban regulation was validly promulgated. Sacks fails, however, to demonstrate a concrete and imminent likelihood that he will be penalized for violations of the restriction on medical donations. Therefore, his challenge to the restriction on medical donations does not fulfill the constitutional requirements of standing and ripeness. We also affirm the district court's holding that the Office of Foreign Assets Control (OFAC) regulation in effect at the time prohibited the government from referring Sacks's unpaid penalty to a private collection agency.

## I.  BACKGROUND

Bertram Sacks traveled to Iraq nine times between 1990 and 2003 in violation of sanctions the United States imposed against Iraq following the 1990 invasion of Kuwait. According to Sacks's Amended Complaint, the twelve years of United States and United Nations sanctions were a dire time for Iraqi civilians, marked by malnutrition, high rates of infant

and child mortality, and shortages of medicine.[1] Sacks, and an advocacy group called Voices in the Wilderness (Voices), opposed these sanctions on humanitarian grounds. In an effort to draw attention to the effect of the sanctions, Sacks and other Voices members traveled to Iraq repeatedly while the sanctions were in effect, bringing with them medicine and medical supplies for which they had failed to procure an export license. They did so in knowing violation of the United States regulations prohibiting travel and the sending of unlicensed humanitarian donations to Iraq. Sacks has been assessed a penalty by the federal government for one violation arising from these trips, and he seeks relief from enforcement of that penalty.

## A.   Iraqi Sanctions

To place this case in context, it is necessary to review the history of the Iraqi sanctions regime. On August 2, 1990, one day after Saddam Hussein's armies invaded Kuwait, President George H.W. Bush issued Executive Order 12,722, which declared a national emergency and imposed sweeping prohibitions on numerous economic and social transactions with

---

[1] In support of his claims, Sacks cites, among other documents, the following sources: UNICEF, *The Situation of Children in Iraq* 20 (2003), *available at* http://www.unicef.org/publications/index_4439.html (reviewing data on increased infant and child mortality during the sanctions regime period and concluding that "most of the children who are dying in Iraq are dying from preventable illness"); UNICEF, *Iraq's Children: A Lost Generation* 3 (2001), *available at* http://www.scn.org/ccpi/UnicefMay2001.html ("Mounting evidence shows that the sanctions are having a devastating humanitarian impact on Iraq."); Marc Bossuyt, U.N. Econ. & Soc. Council, *The Adverse Consequences of Economic Sanctions on the Enjoyment of Human Rights* ¶¶ 63-67 (June 21, 2000), *available at* http://www.globalpolicy.org/security/sanction/unreports/bossuyt.htm ("[T]he sanctions upon Iraq have produced a humanitarian disaster comparable to the worst catastrophes of the past decades. . . . Owing to the lack of medical supplies, it was estimated that, by 1997, 30 per cent of hospital beds were out of use, 75 per cent of all hospital equipment did not work and 25 per cent of Iraq's 1,305 health centres were closed.").

Iraq. 55 Fed. Reg. 31,803 (Aug. 2, 1990). Four days later, the United Nations Security Council passed Resolution 661, which called on all Member States to prevent their nationals from engaging in economic and financial transactions with Iraq except for humanitarian donations of food and medical supplies. Prohibited activities included:

> (c) The sale or supply by their nationals or from their territories or using their flag vessels of any commodities or products, including weapons or any other military equipment, whether or not originating in their territories but not including supplies intended strictly for medical purposes, and, in humanitarian circumstances, foodstuffs, to any person or body in Iraq or Kuwait . . . and any activities by their nationals or in their territories which promote or are calculated to promote such sale or supply of such commodities or products;

S.C. Res. 661, ¶ 3, U.N. Doc. S/RES/661 (Aug. 6, 1990). Following passage of this resolution, President Bush replaced the earlier Executive Order with Executive Order 12,724, a more thorough and detailed set of sanctions, which likewise included an exception for humanitarian donations of food and medicine. It prohibited, among other things:

> (b) The exportation to Iraq . . . , directly or indirectly, of any goods, technology . . . or services either (i) from the United States, or (ii) requiring the issuance of a license by a Federal agency, or any activity that promotes or is intended to promote such exportation, except donations of articles intended to relieve human suffering, such as food and supplies intended strictly for medical purposes;

> (d) Any transaction by a United States person relating to travel by any United States citizen or permanent resident alien to Iraq, or to activities by any

> such person within Iraq, after the date of this order, other than transactions necessary to effect (i) such person's departure from Iraq, (ii) travel and activities for the conduct of the official business of the Federal Government or the United Nations, or (iii) travel for journalistic activity by persons regularly employed in such capacity by a news-gathering organization;

55 Fed. Reg. 33,089, 33,089 (Aug. 9, 1990). For the President's authority to impose these sanctions, Executive Order 12,724 relied upon the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701 *et seq.*, and the United Nations Participation Act, 22 U.S.C. § 287c. 55 Fed. Reg. at 33,089. The Executive Order also made clear that the sanctions described therein could be modified or limited by future regulation, and authorized the Treasury Secretary to promulgate whatever regulations were necessary to carry out its proscriptions. *Id.*

A month after its initial resolution on Iraq, the United Nations Security Council became concerned that the Iraqi government was diverting donated humanitarian food and medical supplies to its military. U.N. SCOR, 4th Sess., 2939th mtg. at 12-13, 19, 25, U.N. Doc. S/PV.2939 (Sept. 13, 1990). It therefore passed a new resolution recommending, among other steps to be taken, "that medical supplies should be exported under the strict supervision of the Government of the exporting State or by appropriate humanitarian agencies." S.C. Res. 666, ¶ 8, U.N. Doc. S/RES/666 (Sept. 13, 1990). When the United States Congress engaged the issue that November, it authorized the President to continue the embargo and sanctions embodied in Executive Order 12,724, but also required that transactions involving "foodstuffs . . . exempted 'in humanitarian circumstances' " be conducted pursuant to the later Security Council Resolution, Resolution 666. Iraq Sanctions Act of 1990, Pub. L. No. 101-513, 104 Stat. 1979, 2048 (1990).

In January 1991, OFAC, an agency within the Department of Treasury responsible for coordinating international sanctions, published a final rule in the Federal Register establishing the Iraqi Sanctions Regulations (the Iraqi Sanctions). 56 Fed. Reg. 2112-01 (Jan. 18, 1991) (codified at 31 C.F.R. §§ 575.101 *et seq.*). These regulations included the two at issue here: 31 C.F.R. § 575.207, which prohibited all United States persons from conducting "any transaction relating to travel by any U.S. citizen or permanent resident alien to Iraq, or to activities . . . within Iraq," except for journalists, United States or United Nations officials, and those assisting American citizens or permanent residents to flee Iraq (the Travel Ban); and 31 C.F.R. § 575.205, which banned the export of goods, services, and technology to Iraq but retained an exception for "donated foodstuffs in humanitarian circumstances, and donated supplies intended strictly for medical purposes, the exportation of which has been specifically licensed" (the Medicine Restrictions). OFAC also established a licensing program to enable humanitarian donations of food and medical supplies, *id.* §§ 575.501, 575.520, 575.521, *repealed by* 68 Fed. Reg. 61,362, 61,363 (Oct. 28, 2003), and a process for assessing penalties against those who violated the sanctions, *id.* §§ 575.701-705. The Iraqi Sanctions remained in place until, soon after the American-led invasion of Iraq in 2003, the United Nations lifted all non-weapons trade restrictions against Iraq, S.C. Res. 1483, ¶ 10, U.N. Doc. S/RES/1483 (May 22, 2003), and OFAC issued a general license permitting all Iraq-related transactions that previously had been prohibited, including unlicensed humanitarian donations, 68 Fed. Reg. 38,188, 38,189 (June 27, 2003) (codified at 31 C.F.R. § 575.533).

## B.   Assessment of the Penalty

Following a highly-publicized November 1997 humanitarian trip to Iraq in which Sacks participated, OFAC issued Sacks a Prepenalty Notice, pursuant to 31 C.F.R. § 575.702. The Prepenalty Notice accused Sacks, other individuals, and

Voices of violating the Iraqi Sanctions.[2] In its Violations section, the Prepenalty Notice described "your and [Voices]' exportation of donated goods, including medical supplies and toys, to Iraq absent specific prior authorization by OFAC." It then listed ten specific violations. Six of these violations accused Voices of exporting medical supplies and/or other goods "absent prior specific license or other authorization." Sacks was individually charged with only one violation:

> 6. Between on or about November 21-30, 1997, Messrs. Handleman, Mullins, Sacks and Zito engaged in currency travel-related transactions to/ from/within Iraq absent prior license or other authorization from OFAC. These currency transactions included, but are not limited to, the purchase of food, lodging, ground transportation, and incidentals;

The Prepenalty Notice proposed a $10,000 penalty for Sacks and the other individuals described in the sixth charge, and a $120,000 penalty for Voices ($20,000 for each of the six violations). It further provided Sacks an opportunity to respond to the charges in writing, which he did. Although he was individually charged only with violating the Travel Ban, in his written response Sacks admitted that he had violated the Medicine Restrictions, as well as the Travel Ban, stating, "You are correct to say in your prepenalty letter (12/3/98) that I brought medical supplies and toys to Iraq absent prior OFAC approval." Although he did not explicitly address the travel charge, the statement that he "brought medical supplies and toys to Iraq" is an implied admission that he had traveled to Iraq.

Three-and-a-half years later, OFAC issued Sacks a formal Penalty Notice, which described his prior admission ambigu-

---

[2]It appears from the record that a single Prepenalty Notice was issued to Sacks and the other named individuals. Presumably, a separate Prepenalty Notice was issued to Voices.

ously: "You admitted the Notice's allegation in Count 6 that you exported goods to Iraq absent prior OFAC approval." Citing his willful violation of the Iraqi Sanctions, OFAC imposed the full $10,000 penalty against him and demanded that it be paid within thirty days. When Sacks did not pay the penalty, he received a letter in August 2003 from the Ocwen Federal Bank, which sought to collect the debt — $13,767.08 including interest and late fees — on behalf of the United States Department of Treasury.

## C.   Procedural History

Seeking to prevent collection of the penalty, Sacks brought suit in the United States District Court for the Western District of Washington against OFAC and its director, Richard Newcomb (collectively, OFAC). He sought declaratory and injunctive relief on the theory that the Medicine Restrictions and the Travel Ban lacked statutory authority and violated principles of international law. Sacks also alleged that OFAC's claims against him were time-barred. The district court granted OFAC's motion to dismiss, holding that the Travel Ban was validly promulgated and enforceable; that, regardless of whether Sacks had standing to challenge the Medicine Restrictions, they too were validly promulgated; that international law did not render these regulations unconstitutional; and that enforcement of the penalty was not time-barred. However, the court held that OFAC was prohibited by its own regulations from referring the unpaid penalty to a collection agency.

Sacks appeals the district court's dismissal only on the ground that the two regulations were invalidly promulgated.[3]

---

[3]Sacks does not appeal the district court's ruling that enforcement of the penalty is not time-barred. Sacks disclaims on appeal the argument that international law forbids the President from placing limits on humanitarian medical donations. Instead, he posits that the international treaties and conventions he cites were background principles that Congress intended to codify when it limited the President's emergency authority in the International Emergency Economic Powers Act of 1977. We discuss this argument below.

OFAC cross-appeals the district court's determination that it could not use an outside collection agency to collect the penalty and was required to refer the penalty to the Department of Justice for collection in a federal civil suit. We have jurisdiction over these consolidated appeals pursuant to 28 U.S.C. § 1291, and we now affirm.

## II.   STANDARD OF REVIEW

We review de novo a district court's grant of a defendant's motion to dismiss. *See Decker v. Advantage Fund, Ltd.*, 362 F.3d 593, 595-96 (9th Cir. 2004). Standing is a question of law reviewed de novo, *see S.D. Myers, Inc. v. City and County of San Francisco*, 253 F.3d 461, 474 (9th Cir. 2001), as are challenges that an agency's regulations exceed its statutory authority, *see Perez-Martin v. Ashcroft*, 394 F.3d 752, 757 (9th Cir. 2005). On cross-appeal, we review the district court's interpretation of OFAC's enforcement regulation de novo, according deference to OFAC's interpretation of its own regulations so long as that interpretation is not plainly erroneous or inconsistent with the regulation. *See League of Wilderness Defenders/Blue Mountains Biodiversity Project v. Forsgren*, 309 F.3d 1181, 1183 (9th Cir. 2002).

## III.   STANDING

**[1]** Sacks challenges two provisions within the Iraqi Sanctions: the Travel Ban and the Medical Restrictions. We must first determine whether he has standing to assert these claims. "[S]tanding is a threshold question which we must resolve before proceeding to the merits." *Los Angeles County Bar Ass'n v. Eu*, 979 F.2d 697, 700 (9th Cir. 1992). This principle is grounded in the "case or controversy" requirement of Article III of the United States Constitution: If Sacks suffered no injury-in-fact caused by the Travel Ban or Medicine Restrictions themselves, then any opinion we render on that provision would be merely advisory. *See Scott v. Pasadena Unified Sch. Dist.*, 306 F.3d 646, 654 (9th Cir. 2002).

The requirements of Article III standing are well-established:

> [A] plaintiff must show (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000). Article III standing requires the plaintiff to establish standing for each challenge he wishes to bring and each form of relief he seeks. *See id.* To survive a Rule 12(b)(6) motion to dismiss, Sacks must allege facts in his Amended Complaint that, if proven, would confer standing upon him. *Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1140 (9th Cir. 2003); *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (noting that, at this stage, "general factual allegations of injury resulting from the defendant's conduct may suffice"). Therefore, we must determine whether Sacks's Amended Complaint identifies an injury caused by each of the two regulations that is both concrete and actual or imminent.

## A.   Travel Ban

**[2]** Sacks has standing to challenge the Travel Ban and the government does not contend otherwise. The Prepenalty Notice that explained the charge against him explicitly mentioned his violation of the prohibition on travel to and currency-related travel transactions within Iraq. Where the "plaintiff is himself an object of the action (or forgone action) at issue . . . there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it." *Lujan*, 504 U.S. at 561-62. The government, through the Ocwen Federal

Bank, now seeks to collect a civil penalty from Sacks for violating the Travel Ban. A civil fine is a pecuniary injury, and "[p]ecuniary injury is clearly a sufficient basis for standing." *Cent. Ariz. Water Conserv. Dist. v. EPA*, 990 F.2d 1531, 1537 (9th Cir. 1993) (internal quotation marks omitted).

### B.   Medicine Restrictions

**[3]** Sacks challenges only the facial validity of the restrictions on unlicensed medical donations, and not the application of the licensing regime. Sacks concedes that he did not apply for an OFAC license to donate humanitarian medical supplies to Iraq, as 31 C.F.R. § 575.521 allowed. We clarified in *United States v. Hugs* that a plaintiff's failure to apply for an available permit precludes him from challenging the operation of the permitting scheme but not the facial validity of the statute or regulations. 109 F.3d 1375, 1378 (9th Cir. 1997). Sacks therefore lacks standing to challenge the operation of the licensing regime but is not prohibited under *Hugs* from facially challenging the Medicine Restrictions.

Sacks cites three reasons why he satisfies the injury-in-fact requirement as to the Medicine Restrictions: (1) he has been actually punished for violating the Medicine Restrictions; (2) he will be called upon to pay the penalties assessed against Voices; and (3) he legitimately fears future prosecution for openly violating the Medicine Restrictions. We find none of these to be persuasive.

**[4]** Sacks contends that his 2003 penalty was assessed for violation of the Medicine Restrictions. We disagree. OFAC's treatment of Sacks indicates its belief that penalties were assessed only for the Travel Ban violation. The Penalty Notice, while confusing, expressly references "Count 6" of the earlier Notice, which referred only to the Travel Ban. Moreover, it was reasonable for OFAC to treat Sacks's admission that he "brought" medical supplies to Iraq as an admission that he traveled to Iraq. As Sacks concedes, bringing

medical supplies to Iraq can be accomplished only by traveling to that country to deliver them. Finally, the $10,000 penalty ultimately levied against Sacks was consistent with those proposed in the Penalty Notice for violating the Travel Ban; in contrast, the proposed penalties for violating the Medicine Restrictions were $20,000 per violation. Therefore, we conclude that Sacks was not penalized for violating the Medicine Restrictions.

**[5]** Nor does Sacks's status as a member of Voices expose him to liability for the penalties assessed against the organization so as to confer standing. Sacks does not suggest that he has third-party standing to challenge the Medicine Restrictions on Voices's behalf; indeed, Voices has already challenged the penalties assessed against it. *See Office of Foreign Assets Control v. Voices in the Wilderness*, 329 F. Supp. 2d 71 (D.D.C. 2004). More importantly, nothing in the Amended Complaint or in the record indicates that Sacks has any financial responsibility for Voices's fine; that action against him has been initiated or is imminent; or even that OFAC has ever turned to individual group members of an unincorporated organization to collect civil fines against the organization. Therefore, Sacks's mere membership in a penalized organization does not create a " 'realistic danger of [his] sustaining a direct injury as a result of the statute's operation or enforcement.' " *LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1154 (9th Cir. 2000) (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)).

**[6]** Finally, Sacks does not face imminent, or even likely, prosecution for violating the Medicine Restrictions. It is true that the Executive Order terminating the "national emergency" in Iraq explicitly reserved the government's right to bring proceedings based on acts in violation of the sanctions committed before the sanctions expired. Exec. Order No. 13,350, 69 Fed. Reg. 46,055, 46,055 (July 29, 2004). Therefore, Sacks theoretically may be subject to penalties for taking medicine

to Iraq, even though the United States has allowed humanitarian medical donations to Iraq since May 2003.

However, while it is well-established that an individual need not await prosecution under a law or regulation before challenging it, *see Babbitt*, 442 U.S. at 298; *Canatella v. California*, 304 F.3d 843, 852 (9th Cir. 2002) (as amended), we require a "genuine threat of imminent prosecution" and not merely an "imaginary or speculative fear of prosecution." *San Diego County Gun Rights Comm. v. Reno*, 98 F.3d 1121, 1126 (9th Cir. 1996) (internal quotation marks omitted).

The requirement that a fear of prosecution be fairly certain to confer standing on the plaintiff is informed by the same considerations as the doctrine of ripeness. The ripeness requirement aims to "prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148 (1967), *abrogated on other grounds by Caifano v. Sanders*, 430 U.S. 99 (1977). As we have previously observed, "the constitutional component of the ripeness inquiry . . . , in many cases, . . . coincides squarely with standing's injury in fact prong." *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1138 (9th Cir. 2000) (en banc). Therefore, we employ the same test to determine if a plaintiff has established standing based on a fear of prosecution that we use to determine if a case or controversy is sufficiently ripe.

> In evaluating the genuineness of a claimed threat of prosecution, we look to whether the plaintiffs have articulated a "concrete plan" to violate the law in question, whether the prosecuting authorities have communicated a specific warning or threat to initiate proceedings, and the history of past prosecution or enforcement under the challenged statute.

*See id.* at 1139 (citing *San Diego County Gun Rights Comm.* 98 F.3d at 1126-27). Whether viewed through the lens of

standing or ripeness, Sacks's challenge to the Medicine Restrictions is not justiciable.

Sacks has established two of the requisite elements required to survive the motion to dismiss on standing or ripeness grounds. He had more than a "concrete plan" to violate the Medicine Restrictions; he admits that he actually did violate them on a number of occasions. *See Jacobus v. Alaska*, 338 F.3d 1095, 1105 (9th Cir. 2003). He also alleges that OFAC has historically targeted other alleged violators of the Medicine Restrictions, including Voices. Because, on review of a district court's Rule 12(b)(6) dismissal, we assume all facts alleged in the Amended Complaint are true, *see Bassidji v. Goe*, 413 F.3d 928, 930 (9th Cir. 2005), these allegations are sufficient to satisfy the first two elements.

Sacks's fear of prosecution runs aground on the government's decision to charge and penalize him for only the violation of the Travel Ban and not for the Medicine Restrictions violation. In *Jacobus v. Alaska*, we similarly confronted a plaintiff who feared future prosecution under a repealed statute. The plaintiffs in *Jacobus* had knowingly violated Alaska campaign finance laws capping contributions to political parties and volunteer professional services to campaigns. 338 F.3d at 1101. In the wake of a district court ruling against the state, the Alaska legislature revised its campaign finance laws to remove the offending provisions, but the state continued to argue their legality on appeal. The Alaska Public Offices Commission (APOC) then wrote Jacobus indicating that "if the law were upheld it reserved the right to prosecute any past violations" he had committed, "although it would not pursue any enforcement action during the pendency of the litigation." *Id.* at 1104. We held that Jacobus faced a genuine threat of imminent prosecution because even though "the letter sent to Jacobus does not threaten to initiate enforcement proceedings in so many words, it indicates that APOC is only awaiting the outcome of the litigation to initiate such proceedings." *Id.* at 1105.

Sacks is in a materially different position than the *Jacobus* plaintiffs. Contrary to Sacks's contention, the government's decision to penalize him for only the Travel Ban violation, when it was fully aware he had also violated the Medicine Restrictions, indicates that the government does *not* intend to penalize him for any of his numerous violations of the Medicine Restrictions. OFAC has not taken the step it normally would take to express its intent to penalize Sacks and thus preserve its right to do so, by sending him a prepenalty notice. The Amended Complaint is devoid of any allegations suggesting that OFAC has communicated an intent to punish him further.

**[7]** To demonstrate the requisite "specific warning or threat to initiate proceedings," *Thomas*, 220 F.3d at 1139, Sacks points only to a footnote in OFAC's Motion to Dismiss that reads: "Although OFAC has not yet acted in response to Plaintiff's eight other trips to Iraq, it reserves the right to do so in the future." While this language is similar to the language used by the agency in *Jacobus*, that alone does not demonstrate that prosecution is imminent. First and foremost, unlike the agency in *Jacobus*, which could not bring charges against the plaintiff because the relevant law had been declared unconstitutional by the district court, nothing has prevented OFAC from charging Sacks under the Medicine Restrictions over the last decade. OFAC's declination to charge him for the Medicine Restrictions violations during the last eight years, therefore, is a strong indication of its lack of intent to do so in the future. Furthermore, the footnote Sacks relies on to demonstrate the threat of prosecution does not mention the Medicine Restrictions at all, but rather references his violation for engaging in travel-related transactions. Therefore, Sacks has failed to demonstrate any specific threat of prosecution for violations of the Medicine Restrictions. *See Friends of the Earth*, 528 U.S. at 180 (noting that Article III requires plaintiff's injury to be "actual or imminent, not conjectural or hypothetical").

Moreover, it is not clear from the Amended Complaint that OFAC could still bring charges against Sacks for violating the Medicine Restrictions. The relevant statute of limitations for the government to bring proceedings enforcing a civil penalty is five years from the date of the act. *See* 28 U.S.C. § 2462. A plaintiff's standing is evaluated as of the date the complaint was filed, in this case January 14, 2004. *See Bernhardt v. County of Los Angeles*, 279 F.3d 862, 868 (9th Cir. 2002). The Amended Complaint does not allege that Sacks violated the Medicine Restrictions after January 14, 1999. The alleged violations are thus likely time-barred, diminishing any threat of prosecution that would have supported standing at the outset of this suit. Moreover, even if Sacks had more recently violated the Medicine Restrictions, it is quite possible that the statute of limitations on those violations has also passed, rendering his fears of prosecution moot. *See Jacobus*, 338 F.3d at 1102 (noting that mootness may warrant dismissal where it is " 'absolutely clear that the litigant no longer ha[s] any need of the judicial protection' " he seeks (quoting *Adarand Constructors, Inc. v. Slater*, 528 U.S. 216, 224 (2000))).

**[8]** Because Sacks fails to allege a concrete and imminent injury-in-fact caused by the Medicine Restrictions, this claim is not justiciable both for lack of standing and ripeness. Of course, should OFAC take action to penalize Sacks for violating the Medicine Restrictions at a later date, he would then have standing to challenge their legitimacy. We therefore do not reach Sacks's challenge to the district court's ruling that the Medicine Restrictions were validly promulgated. *See Mustang Marketing, Inc. v. Chevron Products Co.*, 406 F.3d 600, 606 (9th Cir. 2005) ("Our review is not limited to a consideration of the grounds upon which the district court decided the issues; the Court can affirm the district court on any grounds supported by the record.").

## IV.   VALIDITY OF THE TRAVEL BAN

Sacks does not challenge OFAC's basic authority to restrict travel to Iraq at the President's direction under the United

Nations Participation Act (UNPA). *See* 22 U.S.C. § 287c(a) (allowing the President to prohibit rail, sea, and air "communication" with another country in order to comply with United Nations directives); *Karpova v. Snow*, 402 F. Supp. 2d 459, 469 (S.D.N.Y. 2005) (holding that the Iraq Travel Ban is duly authorized by the UNPA). Instead, he alleges that the Travel Ban regulation, 31 C.F.R. § 575.207, exceeded the President's statutory authority because it indirectly regulated the donation of humanitarian medical supplies, something Sacks contends the International Emergency Economic Powers Act (IEEPA) forbids the President from doing. Because the IEEPA imposes no such burden on the President's powers when he acts under the UNPA, we reject this argument.

**[9]** The IEEPA grants the President authority to unilaterally impose regulations on economic transactions between the United States or its nationals, and foreign countries or their nationals. 50 U.S.C. § 1702(a)(1). To trigger this authority, the President must declare a "national emergency" necessitated by an "unusual and extraordinary threat." *Id.* § 1701. However, the President's power under the IEEPA is constrained: It "does not include the authority to regulate or prohibit, directly or indirectly . . . donations, by persons subject to the jurisdiction of the United States, of articles, such as food, clothing and medicine, intended to be used to relieve human suffering," unless the President determines that such donations would seriously impair his ability to address the emergency or would endanger the safety of American combat forces engaged in hostilities. *Id.* § 1702(b)(2). The President, acting under the IEEPA, is also precluded from regulating the export of postal, telegraphic, telephonic and personal communications; information or informational materials, including magazines, photographs, and artwork; and travel to or from a country. *Id.* § 1702(b).

As the district court recognized, however, the IEEPA is not the lone source of the President's power to enact economic sanctions. Executive Order 12,724, which instructed the Trea-

sury Secretary or his designate (OFAC) to promulgate regulations enforcing the economic sanctions against Iraq, derived its power from both the IEEPA and the UNPA. 55 Fed. Reg. 33,089 (Aug. 9, 1990). OFAC contends that Congress did not intend the IEEPA's limits to interfere with the President's authority under the UNPA. Our review of the structure and plain language of the two statutes convinces us that OFAC is correct.

[10] The economic restrictions authorized by the IEEPA (and the related limits on that authority) are confined to a particular circumstance: the declared national emergency. *See* 50 U.S.C. § 1701(b) ("The authorities granted to the President by section 1702 of this title may only be exercised to deal with an unusual and extraordinary threat with respect to which a national emergency has been declared . . . ."); *id.* § 1702(b) ("The authority granted to the President *by this section* does not include the authority to regulate [humanitarian aid, travel, etc.]." (emphasis added)). The IEEPA also requires the president to consult with Congress before acting, and to regularly consult and report to Congress after exercising his authority. *Id.* § 1703. By contrast, the UNPA allows the President to impose sanctions that are more wide-ranging, without any built-in congressional review and "[n]otwithstanding the provisions of any other law." 22 U.S.C. § 287c. When called upon to enforce a Security Council directive, the UNPA authorizes the President:

> to the extent necessary to apply such measures . . . [to] investigate, regulate or prohibit, in whole or in part, economic relations or rail, sea, air, postal, telegraphic, radio and other means of communication between any foreign country or national thereof . . . and the United States or any person subject to the jurisdiction thereof.

*Id.* The UNPA thus authorizes the President to take measures when enforcing a Security Council resolution, such as limit-

ing postal communication and air travel, that he could not take independently by declaring a national emergency. Sacks's proposed interpretation would treat Congress's passage of the IEEPA in 1977 as a partial sub silentio repeal of the UNPA. We are reluctant to conclude that a statute has been repealed without a clear statement from Congress: "[E]ven when two statutes are in some conflict, repeal is to be regarded as implied only if necessary to make the latter-enacted law work, and even then, only to the minimum extent necessary." *Lujan Armendariz v. INS*, 222 F.3d 728, 744 (9th Cir. 2000) (internal quotation marks and brackets omitted).

**[11]** We refuse to read Congress's passage of the IEEPA as repealing key provisions of the UNPA. Proper functioning of the IEEPA does not depend on a repealing of the UNPA, since the two statutes authorize presidential actions in unique, albeit sometimes overlapping, situations. Reading the statutes to avoid a conflict maintains the complete viability of both statutes and is most faithful to Congress's plain language.

The legislative history of the IEEPA and the UNPA supports our view. The IEEPA was passed by Congress to counter the perceived abuse of emergency controls by presidents to unilaterally sanction foreign governments or interfere with international trade in non-emergency, peacetime situations. The Senate Committee Report explains:

> The bill is a response to two developments: first, extensive use by Presidents of emergency authority under section 5(b) of the Trading with the Enemy Act of 1917 to regulate both domestic and international economic transactions unrelated to a declared state of emergency, and second, passage of the National Emergencies Act of 1977 which provides safeguards for the role of Congress in declaring and terminating national emergencies . . . .

S. Rep. No. 95-466, at 2 (1977), *as reprinted in* 1977 U.S.C.C.A.N. 4540, 4541. The Senate Report then describes

the four national emergencies that were in effect in 1976, two of which had been in place for more than twenty-five years. *Id.* at 4541-42.

[12] By contrast, the Senate Report accompanying passage of the UNPA acknowledged that the statute granted extraordinary powers to the President to enforce United Nations sanctions as quickly as possible, but stated the Committee's belief that such powers were necessary to fulfill the United States's obligations under the United Nations Charter and make international sanctions effective. As the House Report states,

> The committee realizes that the powers proposed to be granted to the President under this section are very great. However, the basic decision in this regard was made when the Charter was ratified and this provision is simply a necessary corollary to our membership in this Organization [the U.N.]. The committee also believes that the Security Council must be placed in the most effective position possible to act under article 41 since the prompt and effective application of economic and diplomatic sanctions by all the United Nations (or even the threat or possibility thereof) may avoid the necessity for the use of the armed forces available to the Security Council.

> The better prepared this country is to participate promptly in action of this kind, the more effective will be the Security Council and the more hope there will be that the United Nations may serve its major purpose, namely, the prevention of armed conflict.

U.S. Code Cong. Serv., 79th Cong., p. 932 (1945). This legislative history confirms what the plain text of the statute indicates: that the IEEPA significantly restricted the President's emergency authority but did not intend to alter the President's

"very great" powers to impose economic sanctions enforcing a United Nations resolution.

Nor does the IEEPA's legislative history indicate, as Sacks contends, that the statute was intended to codify and make binding international law principles on humanitarian relief that had emerged since the passage of the UNPA thirty years earlier. Neither the IEEPA nor its legislative history mentions international law or a universal right to medical supplies. Congress's only indication of its intent in exempting medical supplies from the President's emergency powers is a statement in the Senate Report that the exemption would "enable U.S. persons to make humanitarian contributions in accordance with their conscience." S. Rep. No. 95-466, 1977 U.S.C.C.A.N. at 4544. Sacks's claim of congressional intent is further belied by the IEEPA provision allowing the President to unilaterally regulate, or even prohibit, humanitarian medical supplies simply by declaring that doing so is necessary to address the declared national emergency, as President George W. Bush did when he prohibited the export of humanitarian supplies to al-Qaeda and other terrorist entities following the September 11, 2001 terrorist attacks. *See* Exec. Order No. 13,224, 66 Fed. Reg. 49,079, 49,080-81 (Sept. 23, 2001).

**[13]** Therefore, the district court correctly held that the medical supplies exception to presidential power embodied in the IEEPA did not limit the President's ability to ban travel to and within Iraq pursuant to the UNPA.[4]

## V.   USE OF COLLECTION AGENCY

In its cross-appeal, OFAC asks us to vacate the district court's injunction prohibiting OFAC's use of the Ocwen Fed-

---

[4]Beause we conclude that the IEEPA provisions do not restrict the President's authority under the UNPA, we do not reach OFAC's argument that the Travel Ban is not an indirect regulation of humanitarian medical donations.

eral Bank to collect Sacks's unpaid penalty. Because the OFAC regulation in effect when Sacks's penalty was assessed clearly required referral exclusively to the United States Department of Justice for collection in a federal civil suit, we affirm the district court's issuance of the injunction.

Neither Executive Order 12,724 nor the Iraq Sanctions Act specified the method by which penalties should be imposed or collected, effectively leaving that gap to be filled by OFAC, the agency to which the President delegated his regulatory powers over the Iraqi Sanctions. *See Morton v. Ruiz*, 415 U.S. 199, 231 (1974) ("The power of an administrative agency to administer a congressionally created . . . program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress."). OFAC promulgated regulations for the collection of unpaid penalties under the Iraqi Sanctions. In relevant part, they read:

> In the event that the person named does not pay the penalty imposed pursuant to this subpart or make payment arrangements acceptable to the Director within 30 days of the mailing of the written notice of the imposition of the penalty, the matter shall be referred to the United States Department of Justice for appropriate action to recover the penalty in a civil suit in a Federal district court.

31 C.F.R. § 575.705 (2002). OFAC claims that this provision also allowed it to use administrative collection efforts, including outside collection agencies, to obtain unpaid penalties.

Where an agency offers an interpretation of its own regulations in federal court, we must give "substantial deference" to that interpretation "unless an alternative reading is compelled by the regulation's plain language or by other indications of the [agency's] intent at the time of the regulation's promulgation." *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994) (internal quotation marks omitted). We will defer to

the agency's interpretation of its own regulation, unless that interpretation is "plainly erroneous or inconsistent with the regulation." *Udall v. Tallman*, 380 U.S. 1, 16-17 (1965); *Rendleman v. Shalala*, 21 F.3d 957, 961 (9th Cir. 1994).

**[14]** Here, the agency's command is absolute: if the penalty is unpaid after thirty days, "the matter shall be referred to the [Justice Department] for appropriate action to recover the penalty in a civil suit." Following the guidance of the Supreme Court, *see, e.g., Lopez v. Davis*, 531 U.S. 230, 241 (2001) (explaining the difference between Congress's use of the "permissive 'may' " and its "use of a mandatory 'shall' "), we have previously made clear that Congress's or an agency's use of the word "shall" indicates a mandatory duty that is not subject to discretion. For example, in *Center for Biological Diversity v. United States Forest Service*, 349 F.3d 1157, 1167 (9th Cir. 2003), we held that a Council on Environmental Quality regulation stating that an agency "shall" discuss opposing viewpoints and its response to them in a final environmental impact statement could not be satisfied merely by including and analyzing a more environmentally-restrictive alternative to the proposed plan. Similarly, in *Webber v. Crabtree*, 158 F.3d 460, 461 (9th Cir. 1998) (per curiam), we held that a Bureau of Prisons regulation stating that wardens "shall identify" outdoor smoking areas left the warden no discretion but to do so. Although we will depart from the interpretation of "shall" as mandatory where a "convincing argument to the contrary is made," *Newman v. Chater*, 87 F.3d 358, 361 (9th Cir. 1996) (internal quotation marks omitted); *see also Sierra Club v. Whitman*, 268 F.3d 898, 904 (9th Cir. 2001), such occasions are rare. OFAC offers three reasons to support its contentions that we should disregard the plain language of the regulations. None of these is persuasive.

First, OFAC argues that all government agencies are authorized, and even encouraged, to utilize private collection agencies and other administrative collection efforts before referring cases to the Department of Justice. We do not dis-

agree. For example, 31 U.S.C. § 3718(a) expressly authorizes federal agency heads to establish contracts with collection services to recover United States assets. Current Treasury Department regulations, codified in 2002, go even further, indicating that every unpaid debt should be referred for debt collection services, 31 C.F.R. § 5.9, that multiple collection remedies should be utilized, *id.* § 5.2, and even that "aggressive collection activity" should take place before referral to the Department of Justice, *id.* § 5.16. We may even accept, without deciding, OFAC's contention that it would not need to adopt an explicit regulation before utilizing administrative collection efforts. As the district court noted, however, what OFAC overlooks in emphasizing these general, permissive provisions is that the one provision that specifically addresses violations of the Iraqi Sanctions, 31 C.F.R. § 575.705, did not take advantage of OFAC's authority to permit the use of outside collection agencies and, in fact, made referral to the Justice Department mandatory. *See Bonneville Power Admin. v. FERC*, 422 F.3d 908, 916 (9th Cir. 2005) (discussing the "basic principle of statutory construction . . . that the specific prevails over the general"). We do not know why the Iraqi Sanctions failed to provide for administrative collection efforts or the utilization of collection agencies.[5] This omission may have reflected the due process concern that individuals might face harassment by aggressive nongovernmental collec-

---

[5]The sanctions regulations established before the Iraqi Sanctions Regulations similarly mandated referral to the Department of Justice, and did not provide for other collection efforts. At some point in the 1990s, however, without the prompting of a court decision, OFAC began including language in its sanctions regulations that unpaid penalties shall be, or may be, "referred for administrative collection measures . . . or to the United States Department of Justice" for recovery in a civil suit. *See, e.g.*, 58 Fed. Reg. 13,199, 13,212-13 (Mar. 10, 1993) (codified at 31 C.F.R. § 585.705) (Yugoslavian sanctions regulations); 60 Fed. Reg. 47,061, 47,073 (Sept. 11, 1995) (codified at 31 C.F.R. § 560.706) (Iranian sanction regulations); 61 Fed. Reg. 3805, 3812 (Feb. 2, 1996) (codified at 31 C.F.R. § 595.705) (terrorism sanction regulations); 70 Fed. Reg. 48,240, 48,524 (Aug. 16, 2005) (codified at 31 C.F.R. § 537.705) (Burmese sanctions regulations).

tion agencies for penalties of up to $250,000, without ever having had an opportunity to challenge their penalties before an Article III court. Regardless of the rationale for the regulation, there is nothing in the regulatory scheme or the President's Executive Order that would justify the abandonment of the general rules that the plain language of a regulation controls, and that "shall" indeed means "shall."

Second, OFAC points to its recent revision of section 575.705 as evidence of how the previous section 575.705 was understood and should be interpreted. In response to the district court's ruling in this very case, OFAC issued a rule revising 31 C.F.R. § 575.705 to read that, if the penalized individual does not make arrangements to pay within thirty days, "the matter *may be referred for administrative collection measures by the Department of the Treasury or to the United States Department of Justice* for appropriate action to recover the penalty in a civil suit in a Federal district court." 70 Fed. Reg. 15,761, 15,762 (Mar. 29, 2005) (emphasis added). While OFAC does not argue that the revised regulation applies retroactively, it contends that the revision is dispositive proof that OFAC consistently has interpreted the collection regulation to provide for administrative collection in addition to civil suits in federal court. *See* 70 Fed. Reg. at 15,761 (stating that the rule was revised "to reaffirm that administrative collection of unpaid civil penalties imposed by OFAC is authorized in addition to judicial means of collection"). It is unclear why an interpretive statement added to the Federal Register post-litigation should be entitled to any more deference than the litigation position OFAC already advances. Indeed, although an agency interpretation first articulated in a legal brief is not categorically "unworthy of deference," OFAC's position appears to be little more than a "*post hoc* rationalization advanced . . . to defend past agency action against attack." *Auer v. Robbins*, 519 U.S. 452, 462 (1997) (internal quotation marks omitted) (alteration in original). Even if OFAC's interpretive statement represents the agency's reasoned interpretation as of 2005, it tells us nothing of

the agency's interpretation during the life of the Iraqi Sanctions. As such, the statement in the Federal Register is neither controlling nor particularly helpful.

Third, OFAC makes the novel claim that section 575.705's "silence concerning administrative collection remedies" permits the use of those remedies in satisfaction of the regulatory requirement. In other words, a regulation or statute mandating that an agency "shall" do $x$ in fact means that it "shall" do $x$ *or y*, unless the statute or regulation explicitly states that it "shall not" do $y$. This proposed "rule of the silent disjunctive" is patently absurd. By OFAC's rationale, the Endangered Species Act's requirement that the final determination of whether a species is threatened "shall be published in the Federal Register" could also be satisfied by publishing that information in USA Today. Though the Mandatory Victims Restitution Act requires that the sentencing court *shall* order the defendant to pay restitution, applying OFAC's proposed interpretive rule, the sentencing court could also comply with the statute by ordering the defendant to make a public apology. Or, to bring the examples closer to home, the requirement of former 31 C.F.R. § 575.521 that an application for a license to send medicine to Iraq "shall be made in advance" of the exportation could have been satisfied by Sacks if he submitted an application in advance *or* within ten years following the exportation.

We rejected a similar argument in *Webber*, where the warden asserted that a regulation stating that he "shall" identify outdoor smoking areas at federal prison facilities, to prevent employee exposure to second-hand smoke, also would allow him to achieve that goal by banning all smoking at the facility, 158 F.3d at 461. Our view has not changed. We will not require that Congress or an agency articulate all of the acts the agency may *not* engage in simply to guarantee that mandatory prescriptions are followed.

Our decision in *Lawrence v. Commodity Futures Trading Comm'n*, 759 F.2d 767 (9th Cir. 1985), is not to the contrary.

In *Lawrence*, a commodities broker consented to findings that he had violated the Commodities Exchange Act and agreed to pay a $3,500 civil penalty. *Id.* at 769. When he refused to pay the penalty, the Commodity Futures Trading Commission suspended his registration pursuant to a statutory provision allowing it to do so if an individual violated one of its rules or orders. *Id.* at 770 & n.5 (citing 7 U.S.C. §§ 12a(3)-(4)). Lawrence argued that the Commission was powerless to suspend him because a separate statutory provision stated that "collection of overdue money penalties imposed by the [Commission] shall be referred to the Attorney General for recovery in a federal district court action." *Id.* at 771 (citing 7 U.S.C. § 9a). We rejected Lawrence's claim, holding that referral to the Justice Department was not intended to be the Commission's "exclusive remedy for violation of its orders to pay fines." *Id.* at 772. Despite OFAC's multiple citations to it, *Lawrence* is inapposite. The alternative remedy taken by the Commission, suspension of Lawrence's registration, was explicitly articulated in the same statute, whereas nothing in the Iraqi Sanctions regulations mentions administrative collection. Furthermore, as we recognized in *Lawrence*, suspension of the license and referral to the Justice Department were not mutually exclusive remedies. *See id.* at 771-72. The *Lawrence* court was not required to reach the question of whether the agency could *collect* the penalty using means other than Justice Department referral because suspension of his registration was a different punishment altogether.

**[15]** Rather than adopt OFAC's troublesome "rule of the silent disjunctive," we hold that the plain language of the regulation authorizes no other methods for the collection of unpaid penalties. Because the regulation is clear, no deference is owed to OFAC's questionable interpretation. *See Thomas Jefferson Univ.*, 512 U.S. at 512. If OFAC wishes to collect the $10,000 penalty from Sacks, it may do so by referring the matter to the Department of Justice for the filing of a civil suit in federal district court as its own regulation mandates.

## VI.   CONCLUSION

Sacks lacks standing to challenge the Medicine Restrictions, and his challenge to the Travel Ban fails because OFAC's power to promulgate it was authorized by the UNPA and not limited by any other statute. Therefore, the penalty against Sacks is valid. However, OFAC is precluded by its own then-operative regulations from utilizing the Ocwen Federal Bank or any private third-party entity to collect the $10,000 penalty from Sacks. Therefore, we AFFIRM the district court's order dismissing Sacks's complaint for declaratory relief. We also AFFIRM the district court's order enjoining OFAC from collecting the penalty from Sacks in a manner inconsistent with the then-effective version of 31 C.F.R. § 575.705.

**AFFIRMED.**