**NOT FOR PUBLICATION**

## UNITED STATES BANKRUPTCY APPELLATE PANEL

## OF THE NINTH CIRCUIT

In re:                        ) BAP No. CC-10-1275-SaPaKi

WILSHIRE COURTYARD,         ) Bk. No. 97-10771

         Debtor,

_____ )

CALIFORNIA FRANCHISE TAX BOARD,   )

         Appellant

v.                          ) **M E M O R A N D U M**[1]

WILSHIRE COURTYARD; JEROME H.
SNYDER GROUP I, LTD.; LEWIS P.
GEYSER REVOCABLE TRUST; GEYSER
CHILDREN'S TRUST, FBO JENNIFER
GEYSER, LEWIS P. GEYSER, TRUSTEE;
WENDY K. SNYDER; JEROME H. SNYDER;
GEYSER CHILDREN'S TRUST, FBO
DANIEL GEYSER, LEWIS P. GEYSER,
TRUSTEE; RUSSELL & RUTH KUBOVEC,
DECEASED, KUBOVEC FAMILY TRUST,
RITA FARMER, TRUSTEE; WILLIAM N.
SNYDER; JOAN SNYDER; GEYSER
CHILDREN'S TRUST, FBO DOUGLAS
GEISER, LEWIS P. GEYSER, TRUSTEE;
LON J. SNYDER; SNYDER CHILDREN'S
TRUST, FBO WILLIAM N. SNYDER,
LEWIS P. GEYSER, TRUSTEE,

         Appellees.

_____ )

Argued and Submitted on July 25, 2014
at Pasadena, California

Filed - April 7, 2015

Appeal from the United States Bankruptcy Court
for the Central District of California

---

[1] This disposition is not appropriate for publication.
Although it may be cited for whatever persuasive value it may have
(see Fed. R. App. P. 32.1), it has no precedential value. See 9th
Cir. BAP Rule 8024-1.

-1-

Honorable Samuel Bufford, Bankruptcy Judge and
Honorable Vincent Zurzolo, Bankruptcy Judge, Presiding[2]

Appearances:    Lisa W. Chao appeared for Appellant California
Franchise Tax Board; Kenneth John Shaffer of Quinn
Emmanuel Urquhart & Sullivan, LLP appeared for
Appellees Wilshire Courtyard, Jerome H. Snyder
Group I, Ltd., Lewis P. Geyser Revocable Trust,
Wendy K. Snyder, Jerome H. Snyder, Geyser
Children's Trust, FBO Jennifer Geyser, Lewis P.
Geyser, Trustee, Geyser Children's Trust, FBO
Daniel Geyser, Lewis P. Geyser, Trustee, Russell &
Ruth Kubovec, Deceased, Kubovec Family Trust, Rita
Farmer, Trustee, William N. Snyder, Joan Snyder,
Geyser Children's Trust, FBO Douglas Geyser, Lewis
P. Geyser, Trustee, Lon J. Snyder and Snyder
Children's Trust, FBO William N. Snyder, Lewis P.
Geyser, Trustee.

Before: SARGIS,[3] PAPPAS, and KIRSCHER, Bankruptcy Judges.

The parties to this bankruptcy case, and the appeals arising therefrom, survived the real estate crash of the late 1990s, the Y2K "disaster" with the turning of the Millennium, and the real estate implosion of the 2000s, all while fighting over the effect of the April 1998 confirmation of a chapter 11 plan. The complexities of the arguments have increased and the reasons for supporting or rejecting the reasoning of the bankruptcy court have grown. In considering the appeal, this Panel returns to the basics of what was actually decided by the bankruptcy court, the evidence presented, arguments of the parties, and the plain language of the Bankruptcy and Internal Revenue Codes.

For the issues presented on appeal, the ruling of the

---

[2] Bankruptcy Judges Bufford and Zurzolo each entered orders that are implicated in this appeal.

[3] The Honorable Ronald H. Sargis, Bankruptcy Judge for the Eastern District of California, sitting by designation.

-2-

bankruptcy court that the order confirming the chapter 11 plan determined whether the plan provided for a sale of property is REVERSED. Based upon this Panel's de novo review of the summary judgment, the decision of the bankruptcy court granting summary judgment is AFFIRMED.

## APPELLATE HISTORY

This is the second time that the appeal of the bankruptcy court's order at issue has been before this Panel. Previously, this Panel considered whether proper post-confirmation jurisdiction existed for determination of the underlying issues. Concluding that such post-confirmation jurisdiction did not exist, this Panel reversed and ordered that the matter be remanded with instructions to dismiss. In re Wilshire Courtyard, 459 B.R. 416, (9th Cir. BAP 2011).

The Ninth Circuit Court of Appeals reversed, concluding that post-confirmation jurisdiction existed, and remanded to this Panel for further proceedings. Wilshire Courtyard v. Cal. Franchise Tax Bd. (In re Wilshire Courtyard), 729 F.3d 1270 (9th Cir. 2013) ("Wilshire I").

## CHAPTER 11 BANKRUPTCY CASE
## AND CONFIRMED CHAPTER 11 PLAN

This dispute began when Wilshire Courtyard, a California general partnership, ("Debtor"), filed a chapter 11 bankruptcy case on January 8, 1997 ("Wilshire Bankruptcy Case"). Debtor developed and owned two commercial complexes on Wilshire Boulevard in Los Angeles containing almost a million square feet of rental office space (the "Property"). The lender holding the debt secured by the first position lien on the Property ("Senior

-3-

Secured Claim") was Continental Bank, N.A., which secured claim subsequently came to be held by the successor "Senior Secured Creditors" in the Wilshire Bankruptcy Case. Various other entities held subordinated secured debt. Early in the Wilshire Bankruptcy Case, Continental was acquired by Bank of America, N.A. ("BofA"). BofA served as the loan servicer and trustee for the Senior Secured Creditors in the Wilshire Bankruptcy Case. Debtor's total secured debt aggregated almost $350 million. After Debtor defaulted on the Senior Secured Claim in July 1996, and a foreclosure sale was scheduled for January 9, 1997, Debtor filed its chapter 11 bankruptcy petition.

Appellant California Franchise Tax Board ("CFTB") was listed in the creditor mailing matrix filed by Debtor in the Wilshire Bankruptcy Case. Though CFTB received notice of the commencement of the case, CFTB did not file a proof of claim, did not assert any other claim, did not oppose the chapter 11 Plan, and did not otherwise investigate or participate in the Wilshire Bankruptcy Case.

### Confirmed Chapter 11 Plan

The Senior Secured Creditors, Debtor, and the Debtor's partners ("Partners") negotiated the terms of a joint, consensual chapter 11 plan of reorganization ("Joint Plan"). Under the terms of the Joint Plan, the Debtor was restructured from a California general partnership to a Delaware limited liability company — Wilshire Courtyard, LLC ("Wilshire LLC"). After confirmation, Wilshire LLC continued to own and operate the Property. Under the terms of the Joint Plan, Wilshire LLC arranged for a new, nonrecourse loan for approximately $100,000,000, secured by a

-4-

first deed of trust on the Property ("New Secured Financing").

For their part in the reorganization through the Joint Plan, the Senior Secured Creditors agreed to contribute $23,000,000 to Wilshire, LLC, and to release the balance of their secured indebtedness, in part, for receipt of the New Secured Financing proceeds. Additionally, the Senior Secured Creditors acquired a 99% ownership interest in the reorganized Wilshire LLC. For the Partners, confirmation resulted in their receipt of the remaining 1% interest in Wilshire LLC. In addition, the Partners also received approximately $3,500,000 in cash, and a $450,000 loan from the Senior Secured Creditors' entity created to acquire their 99% interest in Wilshire LLC. Other creditors holding the junior secured claim ("Co-Investors"), agreed to accept a $2,500,000 payment on their $221,000,000 secured claim, and to forgive the balance of the claim. Administrative expenses and general unsecured claims totaling around $900,000 were paid in full through the Joint Plan. These transactions in the Joint Plan by which Wilshire LLC became the successor to the Debtor, the New Secured Financing obtained, claims paid, and the releases granted are referred to as the "Transaction."

Debtor's Second Amended Disclosure Statement was approved by the bankruptcy court on February 19, 1998. Notice of the confirmation hearing for the Joint Plan was sent by Debtor to interested parties in the Wilshire Bankruptcy Case on February 12, 1998. However, CFTB was neither served with a copy of the proposed plan nor given notice of the confirmation hearing.

After the confirmation hearing, the bankruptcy court entered an Order Confirming the Joint Plan of Reorganization on April 14,

-5-

1998 ("Confirmation Order"). CFTB acknowledges that it received the "Notice of Order Confirming Chapter 11 Plan" from the Clerk of the bankruptcy court. The Notice stated in relevant part that, "Notice is hereby given of the entry of an order of this Court confirming a Plan of Reorganization. A copy of the order and the plan itself are contained in the Court file located at the address listed herein." This Confirmation Order is the epicenter from which the present dispute emanates.

The Joint Plan having been confirmed, the Wilshire Bankruptcy Case was closed on October 22, 1998. Wilshire LLC contends, and CFTB has not effectively disputed, that the confirmed plan was implemented and consummated. The restructure of the Debtor was accomplished, the Transaction was implemented and the Joint Plan was completed, and Wilshire LLC became the successor to the Debtor.

After confirmation and consummation of the Joint Plan, the Partners reported approximately $208,000,000 in aggregate cancellation of debt income ("CODI") on their individual 1998 California state tax returns. On November 15, 2002, CFTB sent Wilshire LLC and the Partners an "Audit Issue Presentation Sheet" ("AIPS"). The AIPS informed them that CFTB challenged the Partners' characterization of the tax consequences of the Transaction affected by the confirmed Joint Plan as CODI. Rather than $208,000,000 in CODI, CFTB argued that the Partners should have reported approximately $231,000,000 in capital gain income arising from the Transaction. CFTB contends that the treatment of the Senior Secured Creditors' Claim and the Co-Investors' Claim and interests under the Joint Plan constituted a disguised sale of

-6-

the Property. Based on the AIPS, CFTB issued notices of proposed assessments to the Partners on June 15, 2004, totaling approximately $13,000,000 in unpaid income taxes.

The Partners disputed CFTB's assertion that the Transaction resulted in income to the Debtor and the Partners. Over the next five years, CFTB and the Partners engaged in several California state administrative hearings relating to this dispute.

### Enforcement of Joint Plan and Confirmation Order

On May 27, 2009, the dispute shifted from the state administrative proceedings back to the bankruptcy court. Wilshire LLC filed an ex parte motion to reopen the Wilshire Bankruptcy Case. Wilshire LLC argued that through the AIPS and the continuing administrative hearings, CFTB was attempting to collaterally attack the Confirmation Order and Joint Plan by recharacterizing the terms of the Joint Plan as effecting a disguised sale of the Property. Wilshire LLC asserted that the Joint Plan provided for Wilshire LLC, as the reorganized Debtor, to retain ownership of the Property and did not provide for a sale of the Property. The bankruptcy court granted the motion and entered an order reopening the Wilshire Bankruptcy Case on June 4, 2009.

Wilshire LLC then filed a motion for an Order to Show Cause Re Contempt ("OSC") on June 23, 2009.[4] The bankruptcy court issued the OSC on August 12, 2009, directing CFTB to appear before

---

[4] Ex. 4, p. 24. (All references to the Record are from the Exhibits presented by Appellant CFTB, Exhibits 1 - 34, identified by Exhibit ("Ex.") number and the page number at which the referenced document or specific text may be located in the Record.)

the bankruptcy court to show why it should not be held in contempt for collaterally attacking, and by refusing to act in accordance with, the Joint Plan and Confirmation Order.[5]

CFTB responded to the OSC on August 27, 2009, arguing that Wilshire LLC had not given CFTB adequate notice of the terms of the Joint Plan prior to confirmation, of the time for objecting to the plan, or of the confirmation hearing.[6] Therefore, CFTB asserted it was not bound by the Joint Plan and Confirmation Order. Further, CFTB asserted that Wilshire LLC lacked standing to prosecute the OSC motion and issuance of a contempt order by the bankruptcy court against CFTB would be fundamentally unfair because the state tax consequences of the plan terms were never considered by the bankruptcy court. CFTB also argued that the bankruptcy court lacked the authority to determine such taxes. If the court decided the court had authority to determine and Wilshire LLC had standing to prosecute the motion, Wilshire LLC was guilty of laches. CFTB asserted that laches bars the determination because Wilshire LLC delayed raising these issues in the Wilshire Bankruptcy Case during the six-year period after confirmation that the CFTB was prosecuting the issue in the state administrative proceedings.

Wilshire LLC replied on September 9, 2009, arguing that: (1) CFTB had received adequate notice of the filing of the Wilshire Bankruptcy Case and proceedings and entry of the Confirmation Order; and (2) Wilshire LLC had both prudential and

---

[5] Ex. 22; p. 697.

[6] Ex. 6; p. 33.

-8-

constitutional standing to seek enforcement of the Confirmation Order. Additionally, Wilshire LLC argued that CFTB could not prove an affirmative defense of laches.[7]

The bankruptcy court held an initial hearing on the OSC on September 15, 2009. Wilshire LLC and CFTB appeared by counsel; however, the Partners were not represented at the hearing. Only Wilshire LLC had sought the issuance of the OSC.[8] After hearing arguments of counsel, the bankruptcy court directed the parties to submit further briefing whether a contempt motion was proper under the circumstances of this case, and suggested that the Partners should be joined as parties to the proceedings.

After a continued status conference, on March 12, 2010, acting under authority of Rule 7019,[9] made applicable in contested matters by Rule 9014(c), the bankruptcy court ordered the joinder of the Partners in the proceedings. None of the Partners objected to the joinder order.

### Motion for Summary Judgment or Summary Adjudication of Issues

Eleven months after the OSC was filed, Wilshire LLC and the Partners filed a joint Motion for Summary Judgment or Summary Adjudication of Issues on May 3, 2010 ("Motion for Summary

---

[7] Ex. 7; p. 50.

[8] Ex. 4, p. 24; Notice of and Motion for Issuance of Order to Show Cause.

[9] All Rule references are to the Federal Rules of Bankruptcy Procedure, Rules 1001-9037, and all Civil Rule references are to the Federal Rules of Civil Procedure 1-86. Rule 7019 makes Fed. R. Civ. P. 19 for joinder of parties applicable in bankruptcy adversary proceedings.

-9-

Judgment or Summary Adjudication"). In the motion, they repeated Wilshire LLC's earlier contentions concerning CFTB's receipt of adequate notice in the Wilshire Bankruptcy Case, that CFTB's characterization of the Transaction as a disguised sale amounted to a collateral attack on the Joint Plan, and that the Confirmation Order should be enforced under applicable provisions of the Bankruptcy Code.

CFTB filed an opposition to the Motion for Summary Judgment or Summary Adjudication on June 9, 2010, generally countering these arguments. In addition to its earlier arguments, CFTB also argued that the bankruptcy court lacked subject matter jurisdiction to decide the motion and that, if it had jurisdiction, the bankruptcy court should abstain from considering the tax issues. Further, CTFB argued that if the bankruptcy court was inclined to resolve the tax issues and determine whether the Transaction did indeed result in CODI rather than capital gain, CFTB requested a six-month continuance to undertake discovery on that issue.

Wilshire LLC and the Partners responded to CFTB's opposition on June 16, 2010, generally repeating and supporting their earlier arguments.

The bankruptcy court conducted a hearing on both the OSC and summary judgment motion on June 22, 2010, at which all the parties were represented by counsel. The bankruptcy court rejected CFTB's request to submit additional briefing, and denied its request for additional time to conduct discovery. On July 15, 2010, the bankruptcy court issued an Order for Summary Adjudication of

Issues and Continued Hearing ("Summary Adjudication Order").[10]  In the Summary Adjudication Order the court made the following pertinent findings and conclusions:

1.   That jurisdiction existed under 28 U.S.C. §§ 1334(b) and 1346(a), and 11 U.S.C. §§ 346(a) and 346(j) to interpret the terms of the Joint Plan and Confirmation Order.

2.   Finding "V" (page 6 line 17) of Confirmation Order[11] states, "The Joint Plan and all agreements, settlements, transactions and transfer contemplated thereby do not provide for, and when consummated will not constitute, the liquidation of all or substantially all of the property of the Debtor's Estate under Bankruptcy Code section 1141(d)(3)(A); . . ."

3.   The bankruptcy court further concluded that "[b]ecause the [Joint] Plan did not implement a sale or exchange, the release or forgiveness under the [Joint] Plan did not create capital gain income reportable by the [Debtor]."

The Summary Adjudication Order further provided that within ten days of the entry of that Order, CFTB must vacate the assessments which are based on the Joint Plan effectuating a disguised sale or that the Transaction was a sale or exchange. CFTB was further ordered to cease and desist from taking further action in contempt of the Confirmation Order.  The bankruptcy court ordered that it would conduct a further hearing concerning the impact, if any, of Stackhouse v. United States, 441 F.2d 465 (5th Cir. 1971), to consider whether there could be a different tax result for the Partners than for the Debtor (the partnership).[12]

---

[10] Ex. 31, p. 1078.

[11] Ex. 22, p. 702

[12] Summary Adjudication Order, Ex. 31, p. 1080; and Hearing Transcript ("Hrg. Tr.") of June 22, 2010 hearing, Ex. 32, pp. 1124: 16-23, 1125: 1-15.

-11-

**Second Hearing on Motion for Summary Judgment
and August 31, 2010 Written Decision**

The bankruptcy court held a second hearing on July 20, 2010, on the Motion for Summary Judgment or Summary Adjudication. Early in the hearing, the court noted that the Summary Adjudication Order interpreting Finding "V" was effective only as to Wilshire LLC, but only tentative as to the individual Partners based on the court having ordered further briefing and argument on the "Stackhouse issue." After hearing the arguments of the parties, the bankruptcy court announced it would grant summary judgment in favor of both Wilshire LLC and the Partners. Among the statements made by the bankruptcy court at the hearing were that: (a) "Section 1141 provides that all creditors are bound by the plan. This includes [CFTB];" (b) "In this case the plan's results also apply to the Debtor's partners,. . .;" and (c) "so [CFTB's] actions are in contempt of the confirmation order and [CFTB] is ordered to cease and desist."[13]

On August 31, 2010, the bankruptcy court issued a written Decision entitled "Opinion on the Summary Judgment Motion" ("August 31 Decision").[14] No further order was issued after the July 20, 2010 continued hearing. In the August 31 Decision the bankruptcy court made the following determinations:

1. "[B]ecause [CFTB] received both the case commencement notice and a notice of entry of the confirmation order, the notice provided to [CFTB] was constitutionally adequate and did not deny [CFTB] its due process rights." Ex. 38, p. 1486.

---

[13] Ex. 37; Hr'g Tr., p. 1479:1-3; 8-9; 18-19 (July 20, 2010 Continued Hearing on Motion for Summary Judgment or Summary Adjudication).

[14] Ex. 38, p. 1483.

-12-

2. "[T]he interests of the Partners are wholly derivative from the status of the Property in the partnership." *Id.*, p. 1483.

3. "The confirmation order specifically provided that the plan and transactions thereunder 'do not provide for, and when consummated will not constitute, the liquidation of all or substantially all of the property of the Debtor's estate.'" *Id.*, p. 1484

4. "Because the [CFTB] is bound by the chapter 11 plan, . . ., the action now taken by [CFTB] [to recharacterize the Transaction as a disguised sale] in contravention of the plan is an impermissible collateral attack on confirmation order." *Id.*, p. 1487.

5. "[CFTB's] attempt to recharacterize the [Transaction] as a disguised sale would nullify the effect of the [1980 Bankruptcy Tax Act which overturned *Stackhouse*] and would ignore the interplay between § 346 and relevant IRC Provisions [IRC § 108(a)(1)] allowing debtor to exclude CODI from its realizable income." *Id.*, p. 1488

6. [W]hen there is a cancellation of indebtedness at the partnership level . . . , there is no realized taxable income, even at the partner level, when a partnership does not realize CODI." *Id.*

## October 4, 2010 Order Granting Summary Judgment

On October 4, 2010, the bankruptcy court entered a final "Order Granting Summary Judgment" ("Summary Judgment Order").[15] This final order was consistent with the August 31 Decision, with the court making some additional findings and conclusions, which are paraphrased as follows:

1. The court summarily adjudicates and interprets Finding "V" of the Confirmation Order to establish that the transaction implemented under the Joint Plan is not a sale or exchange for any purpose.

2. The court summarily adjudicates and interprets Finding X of the Confirmation Order and the Joint Plan Article VI.A.2 to establish that the transfers and transactions implemented under the Joint Plan are not a sale of partnership interests by the existing Partners.

---

[15] Ex. 39, p. 1491.

-13-

3. The court summarily adjudicates and interprets Finding "X" of the Confirmation Order to establish that the transfers and transactions contained in Joint Plan Article VI.A., and specifically Article VI.A.2., to be a capital contribution to Wilshire LLC in return for receiving the LLC interests.

4. The court summarily adjudicates and interprets Finding "Y" of the Confirmation Order and Joint Plan Article VII.A and C to establish that the junior secured claim in the approximate amount of $221 Million is released and discharged for payment of $2.5 Million as provided in Joint Plan Article V.C-2.

5. The court summarily adjudicates and interprets Bankruptcy Code § 346 (as it existed in 1997) as applying to the State of California so that income is not realized by (1) the bankruptcy estate, (2) debtor, or (3) successor to debtor by reason of forgiveness or discharge of indebtedness under Title 11.

6. The excluded discharge of indebtedness is income subject to passthrough pursuant to IRC Section 702(a) resulting in a basis increase under IRC Section 705.

7. The CFTB Assessments (Ex. 14, pp. 223-257) of taxes on the Partners constitute an impermissible collateral attack on the Confirmation Order and Joint Plan based on the requirement on a government unit to raise the tax avoidance issue either at or before the confirmation hearing, or in the event of fraud within 180 days thereafter as provided in 11 U.S.C. §§ 1129(d) and 1144.

8. CFTB is ordered to vacate the Assessments within ten days of the entry of this Order Granting Summary Judgment.

**THE SUMMARY ADJUDICATION ORDER, SUMMARY JUDGMENT ORDER, AND THE AUGUST 31 DECISION ARE PROPERLY ON APPEAL**

On July 26, 2010, CFTB filed a Notice of Appeal ("First Notice of Appeal") in connection with the Motion for Summary Judgment or Summary Adjudication.[16] The First Notice of Appeal states that CFTB appeals to the Bankruptcy Appellate Panel from: (1) the Summary Adjudication Order (filed July 15, 2010), (2) the "July 20, 2010 Decision," and (3) "any judgment, order or decree related to such decision, which has not, as yet, been issued."

---

[16] Ex. 33, p. 1128.

-14-

On October 13, 2010, CFTB filed a second Notice of Appeal in connection with the Motion for Summary Judgment or Adjudication ("Second Notice of Appeal").[17] The second Notice states that CFTB appeals to the Bankruptcy Appellate Panel from: (1) the July 15, 2010 Order for Summary Adjudication and Continuing Hearing, (2) the July 20, 2010 oral decision of the bankruptcy court and any judgment, order or decree related to that oral decision, which has not, as yet been issued, (3) the August 31 Decision, and (4) the Order Granting Summary Judgment.

CFTB argues that the bankruptcy court lacked jurisdiction to issue the Summary Judgement Order on October 4, 2010, because CFTB filed a Notice of Appeal of the Summary Adjudication Order on July 25, 2010. CFTB contends that the Summary Judgment Order filed on October 4, 2010, altered and expanded the Summary Adjudication Order previously filed on July 15, 2010, which was the subject of the July 25, 2010 Notice of Appeal. In support of this contention, CFTB cites Rains v. Flinn (In re Rains), 428 F.3d 893, 904 (9th Cir. 2005) for the basic legal principle that, once a notice of appeal is filed, the bankruptcy court may not finally adjudicate substantial rights directly involved in the appeal. CFTB concludes that the August 31 Decision is the judgment or order from which it has appealed, and the October 4, 2010 Order altered that judgment or order. CFTB's arguments miss the mark on several points.

First, subject to exceptions not applicable here, an appeal may be taken as a matter of right only from a final judgment or

---

[17] Ex. 40, p. 1496.

-15-

order. 28 U.S.C. § 158(a)(1). The final judgment or order requirement is intended to preclude piecemeal litigation, conserve judicial energy, and eliminate delays caused by interlocutory appeals. Catlin v. United States, 324 U.S. 229, 233-34 (1945). "In the ordinary course a 'final decision' is one that ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." Ray Haluch Gravel Co. v. Cent. Pension Fund of the Int'l Union of Operating Eng'rs & Participating Emp'rs, 134 S. Ct. 773, 779 (2014)(quoting Catlin, 324 U.S. at 233).

It is clear from the history of hearings and orders in the Wilshire Bankruptcy Case beginning with the Summary Adjudication Order, through the hearings and oral statements from the bankruptcy court at the July 20, 2010 hearing, the issuance of the August 31 Decision, and ultimately the Summary Judgment Order, the final order from which an appeal could be taken as a matter of right was not issued by the court until October 4, 2010. The CFTB incorrectly seeks to treat the August 31 Decision, the Summary Adjudication Order, and the statements of the court at the two hearings as the "final orders" for purposes of appeal – all of which predated the issuance of the actual final order, the October 4, 2010 Summary Judgment Order.[18]

In substance, CFTB complains that the bankruptcy court conducted multiple proceedings and afforded the parties several

---

[18] CFTB's First Notice of Appeal foretells that a final order is to come, stating that CFTB is appealing from not only the Summary Adjudication Order and Decision, but from any other order or decree relating to the motion "which has not, as yet, been issued." Ex. 33, p. 1128.

-16-

opportunities to consider interim rulings and further brief specific issues. Beginning with the bankruptcy court's July 20, 2010 oral statements, and continuing through the August 31 Decision and the final Summary Judgment Order on October 4, 2010, the final legal conclusions made by the bankruptcy court evolved as the judge considered the evidence and arguments. Once the Summary Judgment Order was entered, the universe of the bankruptcy court's findings of fact and conclusions of law was fixed and the final, appealable order issued. The bankruptcy court did not issue such a final order, but continued the hearing on the "Stackhouse Issue" to determine whether the tax assessments could be made against the Partners.

## The Summary Adjudication Order Cannot Be a Final Order

Further, the Summary Adjudication Order did not purport to be a final determination of the Contested Matter, but only a "summary adjudication." The term "summary adjudication" is not a federal procedural term, but one under California state law. "Summary adjudication" is a procedure by which the state court judge may determine some of the claims or issues, but does not conclude the action before the court. The final judgment is, and must be, subsequently issued.[19]

In federal court the analogous rule is found in Civil Rule 56(a), as incorporated by Rule 7056, providing for partial summary judgment on a claim or defense. As noted in MOORE'S FEDERAL

---

[19] See 6 Witkin, Cal. Proc. 5th, §§ 267 - 277, Proceedings Without Trial, for general discussion of the state law principle of summary adjudication.

-17-

PRACTICE, CIVIL § 56.122 (Matthew Bender 3d Ed.), "Of course, the reference to 'judgment' in the term 'partial summary judgment' is a misnomer.  Any ruling that disposes of less than all issues and fewer than all parties in an action is not a judgment within the meaning of Rule 54."  A partial summary judgment order is "not an inherently final order."  Mueller v. Auker, 576 F.3d 979, 1002 (9th Cir. 2009); SEIU, Local 102 v. Cnty. of San Diego, 60 F.3d 1346, 1350 (9th Cir. 1994).

Further, CFTB's assertion that the Summary Adjudication Order is a "final order" does little to avoid piecemeal litigation, and actually has the effect of creating piecemeal, fragmented, potentially inconsistent litigation between the CFTB and Wilshire LLC on the one hand, appealing the Summary Adjudication Order, and then CFTB and Partners in appealing the Summary Judgment Order.

The Summary Judgment Order is the final order from which CTFB could appeal.  The bankruptcy court properly exercised jurisdiction over the Motion for Summary Judgment or Summary Adjudication through and including the issuance of the Summary Judgment Order.  CFTB timely appealed the final order.

## STANDARDS OF REVIEW

The bankruptcy court's decision to grant or deny a summary judgment is reviewed de novo by the appellate court.  Botosan v. Paul McNally Realty, 216 F.3d 827, 830 (9th Cir. 2000).  The same standards used by the bankruptcy court under Civil Rule 56, as made applicable by Rules 7056 and 9014, apply upon appellate review.  Meade v. Cedarapids, Inc., 164 F.3d 1218, 1221 (9th Cir. 1999).  Facts determined for summary judgment proceedings are not entitled to the clearly erroneous standard of appellate review.

-18-

Audrey, Inc. v. Casey (In re Audre, Inc.), 216 B.R. 19, 25 (9th Cir. BAP 1997); Gertsch v. Johnson & Johnson, Finance Co. (In re Gertsch), 237 B.R. 160, 165 (9th Cir. BAP 1999). Summary judgment is not proper if material factual issues exist for trial. Warren v. City of Carlsbad, 58 F.3d 439, 441 (9th Cir. 1995).

An appellate court may base its ruling on any ground supported by the record. Danning v. Miller (In re Bullion Reserve of N. Am.), 922 F.2d 544. 546 (9th Cir. 1991); Gilbert v. Ben-Asher, 900 F.2d 1407, 1410 (9th Cir. 1990), cert. denied, 498 U.S. 865 (1990).

**STANDING, CONSTITUTIONALLY SUFFICIENT
NOTICE, BINDING ORDER CONFIRMING PLAN,
AND NO DETERMINATION OF NATURE OF TRANSACTION**

CFTB first asserts that Wilshire LLC, as successor to the reorganized Debtor, does not meet the minimum Constitutional standing requirements for a party with an actual case or controversy to be adjudicated by the federal courts. U.S. CONST. art 3, sec. 2. A determination of standing is subject to de novo review on appeal. La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest, 624 F.3d 1083, 1087(9th Cir. 2010).

Federal courts are not forums for hypothetical claims or litigation by persons who do not have rights which are the subject of the federal court proceeding (with limited exceptions to this rule, such as class action and other special representative proceedings authorized by Congress). Ne. Fla. Chapter of the Associated Gen. Contractors of Am. v. City of Jacksonville, Fla., 508 U.S. 656, 663 (1993). Standing must be determined to exist before the court can proceed with a case. Sacks v. Office of Foreign Assets Control, 466 F.3d 764, 771 (9th Cir. 2006).

-19-

A person must have a legally protected interest, for which there is a direct stake in the outcome, to have standing in federal court. This fundamental requirement arises under the Constitution. Arizonans for Official English v. Ariz., 520 U.S. 43, 64 (1997). The Supreme Court provided a detailed explanation of the Constitutional case or controversy requirement in Northeastern Florida Chapter of the Associated General Contractors of America v. City of Jacksonville, Florida, supra 508 U.S. at 663. In that decision, the court explained that a party seeking to invoke federal court jurisdiction must demonstrate: (1) injury in fact, not merely conjectural or hypothetical injury; (2) a causal relationship between the injury and the challenged conduct; and (3) the prospect of obtaining relief from the injury as a result of a favorable ruling is not too speculative. Id.

CFTB asserts that Wilshire LLC lacks standing because the taxes at issue are to be paid by the Partners, not the Debtor, citing Culver, LLC v. Chiu (In re Chiu), 266 B.R. 743, 748 (9th Cir. BAP 2001), aff'd, 304 F.3d 905 (9th Cir. 2002). Wilshire LLC counters, arguing that as the entity in which the tax event is determined, and then passed through to the Partners, it has standing to determine the taxes arising from the operation of its business, citing Sprint Communications Co., L.P. v. APCC Servs., Inc., 554 U.S. 269, 287 (2008).

The tax liabilities or benefits of the Partners are wholly derivative of the tax consequences of the Transaction created by and for Debtor through the Joint Plan. Determination of taxable income for a partnership is done in the same manner as for an individual, with that income or loss then passed through from the

partnership to the partners. United States v. Basye, 410 U.S. 441, 448 (1973); 26 U.S.C. §§ 703, 701. The partnership is regarded as an independently recognizable entity apart from the aggregate of its partners. Only once its income is ascertained and reported, then the existence of the partnership may be disregarded and then each partner is attributed a tax attribute for a portion of the total, treating the partnership as merely a conduit through which the partnership's income has passed. Id.[20] For partnerships, the California Revenue and Taxation Code incorporates the provisions of Subchapter K of Chapter 1 of Subtitle A of the Internal Revenue Code (26 U.S.C. §§ 701-776). Cal. Rev. & Tax Code § 17851 (with specific statutory exceptions not applicable to the issue before the court).

Wilshire LLC, as the successor to Debtor, is the "person" whose transaction is the subject of the controversy to determine whether income was generated for tax purposes for the partnership. After the taxation income determination from the Transaction is made for the partnership (Debtor), then the partnership serves as the conduit through which the income (or loss) is passed through

[20] Footnote 8 in United States v. Basye, 410 U.S. at 448, quotes the legislative history, echoing the Solicitor General's remarks that it is odd to be debating the issue of income being determined at the partnership and that being then passed through to the partners. "The legislative history indicates, and the commentators agree, that partnerships are entities for purposes of calculating and filing informational returns but that they are conduits through which the taxpaying obligation passes to the individual partners in accord with their distributive shares. See, e. g., H. R. Rep. No. 1337, 83d Cong., 2d Sess., 65-66 (1954); S. Rep. No. 1622, 83d Cong., 2d Sess., 89-90 (1954); 6 J. Mertens, Law of Federal Income Taxation § 35.01 (1968); S. Surrey & W. Warren, Federal Income Taxation 1115-1116 (1960); Jackson, Johnson, Surrey, Tenen & Warren, The Internal Revenue Code of 1954: Partnerships, 54 Col. L. Rev. 1183 (1954)."

-21-

to the Partners. Wilshire LLC, the successor which emerged from the confirmed Joint Plan, has standing to litigate the Joint Plan issues concerning the nature of the Transaction. Once such determination is made, then Wilshire LLC can properly report such income or losses (or correct previously reported information) to the Partners for inclusion on their tax returns.

The bankruptcy court's determination that Wilshire LLC has standing to prosecute the Order to Show Cause and obtain a determination of the Transaction is correct and is affirmed.

### CFTB Was Provided Constitutionally Sufficient Notice Of The Wilshire Bankruptcy Case

This Panel having determined that Wilshire LLC has standing, next considers CFTB's assertion that it is not bound by the provisions of the Confirmation Order. This argument operates on two levels: first, whether CFTB was bound by the reorganization of the Debtor and Transaction provided for in the Joint Plan and the Confirmation Order; and second, whether specific findings made in the Confirmation Order bind Wilshire LLC, the Partners, and CFTB concerning the nature of the Transaction (whether it was a sale or a non-sale reorganization of the Debtor with debt forgiveness under the Bankruptcy Code). CFTB conflates these two separate issues.

In the Summary Adjudication Order, the bankruptcy court determined that Finding "V" of the Confirmation order establishes that the Transaction was not a sale or exchange for any purpose.[21] The bankruptcy court subsequently issued the August 31 Decision

---

[21] Ex. 31; Summary Adjudication Order, p. 1078.

-22-

which concluded that notice of filing of the Wilshire Bankruptcy Case and the subsequent notice that the Confirmation Order had been entered provided constitutionally sufficient notice that CFTB's rights and interests were determined through confirmation of the Joint Plan.

The touchstone for a question of whether sufficient notice was provided for Constitutional Due Process purposes for a determination of a person's rights or interest in property is Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306 (1950). Such constitutionally sufficient notice must be "[r]easonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." Id. at 314. In the context of bankruptcy proceedings, the issue of Due Process was recently addressed by the Supreme Court in United Student Aid Funds, Inc. v. Espinosa, 559 U.S. 260 (2010). Having received notice of the plan and its contents prior to the bankruptcy court confirming the chapter 13 plan, the Supreme Court found that such notice satisfied United Student Aid Funds, Inc.'s Due Process rights. Id. at 272. As restated in Tulsa Professional Collection Services, Inc. v. Pope, 485 U.S. 478, 484 (1988), notice is constitutionally sufficient when it is reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.

Here, CFTB received notice of both the Wilshire Bankruptcy Case and the Confirmation Order. Had it chosen to act, such as requesting special notice, CFTB could have monitored the Wilshire

-23-

Bankruptcy Case. CFTB cannot now complain that it was not invited by the Debtor to assert whatever rights or objections CFTB might possibly have to the Joint Plan which was moving toward confirmation.

The bankruptcy court's determination that CFTB received sufficient notice of the Wilshire Bankruptcy Case and the proceedings which led to the Confirmation Order is affirmed. The terms of the Joint Plan and Confirmation Order bind Wilshire LLC, the Partners, and CFTB to the Joint Plan.

### Findings in the Confirmation Order Stating the Nature of the Transaction Are Not Binding on CFTB

As the Panel reads Wilshire LLC's and the Partners' briefs, they contend that the Confirmation Order not only confirms the Joint Plan, but "binds" CFTB to a determination stated in the Confirmation Order that, for purposes of tax treatment, the Transaction is not a sale of the partnership assets or interests. This argument overstates the effect of the Confirmation Order.

For this proposition, Wilshire LLC and the Partners direct the Panel to the progeny of Lawrence Tractor Co. v. Gregory (In re Gregory), 705 F.2d 1118, 1123 (9th Cir. 1983). In Gregory the Ninth Circuit Court of Appeals affirmed the lower courts, concluding that notice of a chapter 13 bankruptcy case was sufficient notice to the creditor that confirmation of the plan could lead to the discharge of its debt. The notice of the bankruptcy case put the creditor on inquiry notice that its claim could be affected, including discharged as provided by the Bankruptcy Code, which required the creditor to investigate the case. If the creditor had so acted, it would have seen that

-24-

debtor was seeking to confirm a chapter 13 plan which provided a 0% percent dividend for the creditor's claim and a discharge of that debt upon completion of the Chapter 13 plan.

In 2009, the Ninth Circuit again addressed this issue in <u>Joye v. Franchise Tax Board (In re Joye)</u>, 578 F.3d 1070 (9th Cir. 2009). In <u>Joye</u>, the CFTB (same party as in this appeal) received notice of the <u>Joye</u> bankruptcy case having been filed and that September 3, 2001, was the claims bar date set for governmental claims. The CTFB, with knowledge of the <u>Joye</u> bankruptcy case, did not file a proof of claim until October 15, 2001. In <u>Joye</u>, the court concluded that while having notice of the bankruptcy case, the CFTB "[i]gnored the Joyes' bankruptcy proceeding 'at its peril.'" <u>Id.</u> at 1080.

In the present case, Wilshire LLC does not contend that the proposed Chapter 11 plan or the bankruptcy court file provided notice that confirmation of the Joint Plan would constitute a determination that the Transaction was not a sale. Nor is it asserted that notice was provided that confirmation of the Joint Plan would determine the tax consequences flowing from the Transaction. Rather, Wilshire LLC only argues that by virtue of adding language stating such a "determination" to the order subsequently signed by the bankruptcy judge, that language now binds CFTB.

A review of the Second Amended Disclosure Statement, Section III, Part H, titled "Tax Consequences of Joint Plan," imparts the following information with respect to the tax consequences of confirmation: "CREDITORS AND INTEREST HOLDERS CONCERNED WITH HOW THE JOINT PLAN MAY AFFECT THEIR TAX LIABILITY

-25-

SHOULD CONSULT WITH THEIR OWN ACCOUNTANTS, ATTORNEYS, AND/OR ADVISORS."[22] It continues to state, "The Proponent CANNOT and DOES NOT represent that the tax consequences contained below are the only tax consequences of the Joint Plan because the Tax Code embodies many complicated rules that make it difficult to state completely and accurately all of the tax implications of any action."[23] This Section H of the Second Amended Disclosure Statement restates several times that no representation concerning the actual tax consequences of confirmation and performance of the plan would be made by Debtor.

For the Partners, the Second Amended Disclosure Statement states that there will be a discharge of indebtedness and Partners will recognize cancellation of indebtedness income ("CODI"). The Second Amended Disclosure Statement continues, stating that the Partners may elect to treat the CODI as provided in § 108 of the Internal Revenue Code. Such § 108 treatment may allow the CODI to be excluded from income or Partners may elect to offset it against operating losses.[24] The Joint Plan does not contain any provision either characterizing the Transaction or the tax effects of the Transaction.[25]

The Joint Plan and the Confirmation Order do not constitute the final determination of the Transaction for tax purposes. Such determination was properly the subject of the subsequent post-

---

[22] Id., p. 496:20-22.

[23] Id., p. 496:25-27, 497:1-2.

[24] Id., p. 498:3-13.

[25] Ex. 12; Second Amended Disclosure Statement, pp. 515-561.

-26-

confirmation judicial proceedings in the bankruptcy court which are the subject of this appeal.  The bankruptcy court properly considered CFTB's contentions, rejecting Wilshire LLC's contention that the Joint Plan and Confirmation Order is a final order previously determining that issue between Wilshire LLC and CFTB.

## THE BANKRUPTCY COURT CORRECTLY DETERMINED THAT THE TRANSACTION WAS NOT A SALE

The Ninth Circuit Court of Appeals remanded this appeal to the Bankruptcy Appellate Panel to make a merits determination of whether the bankruptcy court gave "due consideration to the 'economic realities' of the transaction as structured through the [Joint] Plan and Confirmation Order."  These "economic realities" are a consideration of whether there are "tax independent considerations" for the transaction and that the economic substance of the transaction "is not shaped solely by tax-avoidance features that have meaningless labels attached . . . ." Frank Lyon Co. v. United States, 435 U.S. 561, 583-584 (1978).  So long as there are significant and genuine non-tax attributes to the transaction, the form of the transaction adopted by the parties governs for tax purposes.  Id.  See also Sollberger v. Commissioner, 691 F.3d 1119, 1124, n.6 (9th Cir. 2012) (The court conducts a flexible, case-by-case analysis of whether the burdens and benefits of ownership have been transferred.  There are not hard and fast rules of thumb which can be used for such a determination, and no single factor is controlling.  The transaction must be viewed in light of realism and practicality.)

The bankruptcy court determined the Transaction eleven months after the Order to Show Cause was issued.  The bankruptcy court

issued three documents stating the findings and conclusions upon which the Summary Judgment Order is based. For the flexible, case-by-case analysis of whether "tax independent considerations" exist and the economic substance of the Transaction, this Panel, through its de novo review, considers the evidence presented and the findings of fact and conclusions of law to be drawn therefrom.

## First Hearing on Motion for
## Summary Judgment or Summary Adjudication

The hearing on the Motion for Summary Judgment or Summary Adjudication was conducted on June 22, 2010. In its Opposition[26] and at the June 22, 2010 hearing[27] CFTB did not argue that tax independent considerations did not exist or that the economic realities of the Transaction demonstrated that they were only tax driven. Rather, CFTB's arguments focused on why the bankruptcy court did not have jurisdiction (which jurisdiction the Ninth Circuit established does exist in Wilshire I) and why 11 U.S.C. § 346(j) did not apply to the Transaction under the confirmed Joint Plan. CFTB stated at the hearing, "We're not challenging, your Honor, the aspects of the plan."[28] Rather, CFTB asserted that the court does not have jurisdiction to determine the issue if 11 U.S.C. § 346 applied, and the application of the Internal Revenue Code to treat the Transaction as a sale of partnership

---

[26] Ex. 24; Opposition to Motion for Summary Judgment or Adjudication, p. 875.

[27] Ex. 32; Transcript, p. 1085.

[28] Ex. 32; Transcript, p. 1114:8-9.

-28-

interests by the Partners.[29]  At the conclusion of the June 22, 2010 hearing the bankruptcy court did not state any findings of fact or conclusions of law on the record.

### Request for Continuance Was Properly Denied

As part of its Opposition, CFTB requested a six-month continuance so that it could conduct discovery on the issue of whether the Transaction resulted in cancellation of indebtedness.[30] The scope of the requested discovery is set forth in Paragraph 22 of the Declaration of Robert Babcock ("Babcock Declaration") filed in opposition to the Motion for Summary Judgment or Summary Adjudication.[31]  The scope of the discovery described relates to the underlying substance of the Transaction, with discovery to be conducted of the Debtor, creditors, Partners, and Wilshire LLC.

CFTB also filed an Ex Parte Motion for Continuance if the bankruptcy court did not discharge the Order to Show Cause based on CFTB's legal arguments.  CFTB requested the continuance to allow an additional six months to conduct discovery.[32]

The continuance for CFTB to undertake such discovery was not granted by the court.  The bankruptcy court's denial of the request for further discovery before ruling on the motion for summary judgment is reviewed for abuse of discretion. <u>Chance v. Pac-Telerac, Inc.</u>, 242 F.3d 1151, 1161 n.6 (9th Cir. 2011).  The

[29] Ex. 32; Transcript, p. 1114: 1-4, 18-22.

[30] Ex. 24; Opposition, p. 1:19-21, 2:1-14.

[31] Ex. 34; Babcock Declaration, p. 1138.

[32] Ex. 19; Conditional Ex Parte Motion to Continue Hearing, p. 316.

-29-

burden is on the party seeking further discovery to show that it diligently pursued its previous discovery opportunities and that evidence it seeks exists. Id., citing Nidds v. Schindler Elevator Corp., 113 F.3d 912 920 (9th Cir. 1996), and Conkle v. Jeong, 73 F.3d 909, 914 (9th Cir. 1995).

In the Opposition, CFTB theorized that the Transaction resulted in capital gain, and therefore there was no cancellation of indebtedness income which could have been excluded pursuant to Internal Revenue Code ("IRC") § 108 (26 U.S.C. § 108) and 11 U.S.C. § 346(j) would not be applicable. CFTB argued that the Transaction consisted of a sale of 99% of the properties of Debtor for $3,500,000 and cancellation of $284,570,000 of indebtedness.[33] CFTB treated the Transaction as in substance being a sale by the Partners of 99% of their partnership interests to the Senior Secured Creditors who acquired such 99% interest in the Debtor to be their 99% interest in Wilshire LLC. CTFB further contended that the Transaction violated IRC § 701 (which provides that a partnership shall not be subject to the income tax imposed), and that by applying the step-transaction doctrine CFTB can treat the Transaction as one by which Debtor sold a 99% interest in the properties or that the Partners sold 99% of their interests in the Debtor. Evidence was not presented to support these arguments.

As Wilshire LLC and the Partners argue, the briefing and hearing schedule on the Motion for Summary Judgment or Summary Adjudication was set pursuant to a stipulation between CFTB and

---

[33] Ex. 24; Opposition, p. 916:1-9.

-30-

Wilshire LLC ("Scheduling Stipulation").[34] As part of the Stipulation, dated April 22, 2010, CFTB, Wilshire LLC, and the Partners agreed and stipulated to several matters. First, the bankruptcy court had issued an order joining all of the Partners into this Contested Matter. Second, no objection to the joinder by any of the Partners was filed and the Partners were parties to this Contested Matter. CFTB, Wilshire LLC, and the Partners then stipulated that the hearing on the Motion for Summary Judgment or Summary Adjudication occur on June 22, 2010. Further, the Motion for Summary Judgment or Adjudication would be filed by May 3, 2010, Opposition filed by June 7, 2010, and Replies filed by June 15, 2010.

In denying the request for a continuance to undertake discovery, the bankruptcy court noted that no discovery had been attempted by CFTB during the one year that this Contested Matter had been pending. CFTB argued that the issues relating to 11 U.S.C. § 346(j) had not been raised until the filing of the Motion for Summary Judgment or Summary Adjudication. The bankruptcy court noted that the issue of whether 11 U.S.C. § 346 applied had been fully briefed by the parties.

The bankruptcy court further noted that in its September 8, 2009 Reply to CFTB's Response to the Order to Show Cause, Wilshire LLC asserted that the grounds for contempt included the assertion that CFTB's conduct constituting a collateral attack on the Confirmation Order and Joint Plan in violation of 11 U.S.C.

---

[34] Ex. 13; Joint Status Report, p. 166.

§ 346(j).[35] The Reply expressly quoted the language of 11 U.S.C. § 346(j)(1) stating that no income is realized from the forgiveness or discharge of indebtedness in a case under Title 11.[36] There was no "surprise" that 11 U.S.C. § 346 was a basis for the relief requested (contempt for a collateral attack on the Confirmation Order and Joint Plan) from September 8, 2009 forward, and the record shows that CFTB was aware that 11 U.S.C. § 346 was at issue when it entered into the Scheduling Stipulation.

No adequate basis is shown for reversing the bankruptcy court's denial of the Ex Parte Motion for Continuance. No basis is shown for granting relief to CFTB from the stipulation setting the schedule for filing and hearing cross-summary judgment motions. Neither in its brief nor at oral argument on this appeal has CFTB provided any explanation of how it was prevented from conducting discovery during that one-year period after the motion for the OSC was filed. Denial of the request for a continuance is affirmed.

### Bankruptcy Court Determination That The Transaction Was Not A Sale

In the Summary Adjudication Order the bankruptcy court determined that: (1) Finding "V" of the Confirmation Order establishes "[T]hat the transaction implemented under the Plan is not a sale or exchange;" and (2) that since the transaction was

---

[35] Ex. 7; Wilshire LLC's Reply to Opposition to CFTB Response to Order to Show Cause, pp. 67:1 - 68:17.

[36] Id.; p. 67:3-6.

-32-

not a sale or exchange, "[t]he release or forgiveness of indebtedness under the Plan did not create capital gain income reportable by [Debtor]."[37] The court then continued the hearing for further briefing and oral argument on the Stackhouse issue.

The bankruptcy court conducted a further hearing and issued the August 31 Decision.[38] It first determined that the Joint Plan "does not effect a sale of the partners' interest in the partnership property." The bankruptcy court further stated, consistent with the Summary Adjudication Order, that the Joint Plan restructured the Debtor from a general partnership into a limited liability company (Wilshire LLC), with Wilshire LLC, the restructured Debtor, continuing to own the Properties. The bankruptcy court repeated the prior finding and determination pursuant to Finding "V" of the Confirmation Order.

The bankruptcy court, in connection with the substance of the Transaction, made the determination that CFTB's interpretation of the tax laws and the Transaction "would nullify the effect of the [Bankruptcy Tax Act of 1980] at the partner level in a [cancellation of indebtedness] scenario and would ignore the interplay between § 346 and relevant IRC provisions allowing the debtor to exclude [cancellation of indebtedness income] from its realizable income." The bankruptcy court concluded that the Bankruptcy Tax Act of 1980 overruled Stackhouse v. United States, 441 F.2d 465 (5th Cir. 1971), which had previously interpreted the IRC to allow for income to be determined in one manner for a

_____

[37] Ex. 31; p. 1079.

[38] Ex. 38; p. 1483.

-33-

partnership and then in a different manner by the IRS for the individual partners.

The August 31 Decision concludes with the bankruptcy court expressly stating that the Transaction: (1) resulted in discharge of indebtedness; (2) was not a disguised sale; and (3) did not result in a capital gain.

The court then issued the Summary Judgment Order on October 4, 2009, which includes the following determinations by the court concerning the Transaction. First, the court interpreted and adjudicated Finding "X" of the Confirmation Order to establish that the Transaction was not a sale of the partnership interests. Second, that there was a capital contribution by the Senior Secured Creditors for their interest in the restructured Debtor, Wilshire LLC, as part of the Transaction. Third, that Finding "Y" of the Confirmation Order established that the $221,000,000 claim secured by the second deed of trust was released and discharged solely in exchange for the payment of $2,500,000 as provided in the Joint Plan.

**Upon De Novo Review, The Evidence Presented Supports the Determination That The Transaction Was Not a Sale**

The CFTB complains that the bankruptcy court did not, and could not, have really considered the "economic realities" of the transaction because it was not presented with evidence of the transaction by CFTB. As discussed above, this Panel, upon completing its de novo review, concurs with the decision of the bankruptcy court in denying CFTB's request for a continuance to begin discovery on the eve of the stipulated hearing on the Motion for Summary Judgment or Summary Adjudication. CFTB was aware

-34-

since September 2009 that the 11 U.S.C. § 346 discharge or forgiveness of indebtedness was at the core of Wilshire LLC's contention that CFTB was engaging in an impermissible collateral attack of the confirmed Joint Plan and Confirmation Order. CFTB's strategy decision to not present any additional evidence does not mean that the bankruptcy court did not have evidence from which it made its decision, and this Panel can conduct its de novo review.

The federal judicial process is not a GIGO (garbage in, garbage out) system. Irrespective of the sufficiency of the legal briefs, a federal judge has the responsibility to make his or her decision based on the correct law. United Student Aid Funds, Inc. v. Espinosa, 559 U.S. at 277. However, the federal judge is dependant on the parties to present the competent, credible evidence from which the judge is to make the required findings of fact. In making the requisite findings of fact and making the conclusions of law therefrom, the judge should not go outside the record unless the facts are matters of common knowledge or capable of certain verification (Fed. R. Evid. 201, Judicial Notice). Clicks Billards, Inc. v. Sixshooters, Inc., 251 F.3d 1252, 1267 (9th Cir. 2001). A party cannot complain that it would have conducted discovery or presented other evidence if it had known in advance the findings of fact and conclusions of law which the court was going to draw from the discovery and other evidence presented at the hearing or trial.

For the bankruptcy court, the evidence of the Transaction provided by Wilshire LLC, the Partners, and CFTB consists substantially of the Disclosure Statement and Joint Plan. The bankruptcy court concluded that the Transaction was not a sale or

-35-

exchange, but a restructure by which the Debtor partnership was reorganized into Wilshire LLC, a limited liability company. While CFTB theorizes whether, if evidence existed and were produced, a court at sometime in the future might determine that the Transaction is not as stated in the Joint Plan, no such evidence was presented by CFTB to the bankruptcy court.

In conducting the de novo review, this Panel concurs that (1) there is not any conflicting evidence of any material fact and (2) there are no genuine issues of material fact – only a dispute as to the legal conclusions drawn from the undisputed evidence. From the evidence presented, the bankruptcy court did not err in concluding that the Joint Plan and Transaction constituted a reorganization of the Debtor into Wilshire LLC, and such reorganization was not a sale, transfer, or a disguised foreclosure or deed in lieu of foreclosure. The Disclosure Statement describes a very complex business transaction by which the Senior Secured Creditors acquire a 99% interest in Wilshire, LLC, the successor reorganized Debtor that emerges from bankruptcy through the Joint Plan. For the Partners, 99% of their interests in the Debtor are lost, with them having only a 1% interest in Wilshire LLC, the reorganized successor to Debtor.

The Joint Plan and Disclosure Statement identify the following assets and claims to be addressed. As of the Second Amended Disclosure Statement, the assets of the Debtor and bankruptcy estate are listed to have a value of $164,645,000, which are subject to the Senior Secured Creditors' lien ($173,570,000 claim) and the Co-Investors' Junior lien

($221,000,000 claim).[39] Under the Debtor's liquidation analysis, this exhausts any value in the assets, or as may be more commonly stated, all creditors and interest holders, other than the Senior Secured Creditors (on at least a portion of their secured claim), are "out of the money." The Liquidation Analysis identifies an additional $850,000 to $900,000 in general unsecured claims which would also "be out of the money" in a Chapter 7 liquidation.

The Disclosure Statement also informs creditors that a settlement was reached and approved by the Court among the Debtor, acting as the then debtor in possession,[40] Senior Secured Creditors, and California Federal Bank. The settlement resolved a lease dispute with California Federal Bank and provided for a new lease of the Property for the Joint Plan. Under the settlement, California Federal Bank also agreed to pay the Estate $27,825,000, assign its existing leases and subleases to the Estate, enter into a new five year lease, dismiss the pending adversary proceeding, and execute mutual releases.

The Joint Plan provides for Wilshire LLC to obtain New Secured Financing of $95,000,000 to $100,000,000 to be paid to the Senior Secured Creditors. The difference between the $123,000,000 portion of the Senior Secured Claim and the payment from the New Secured Financing would constitute the Senior Secured Creditors' capital contribution to acquire the 99% interest in Wilshire LLC.

[39] Ex. 21; Disclosure Statement, p. 509 Liquidation Analysis, and pp. 491-492, Article III, D, Class B and C-2 (Senior Secured Claim), and Class C-2 (Co-Investor Secured Claim).

[40] The debtor in possession serves as the fiduciary of the bankruptcy estate in the place of, and exercising many of the powers of, a Chapter 11 trustee. 11 U.S.C. § 1107.

-37-

The $40,570,000 balance of the Senior Secured Creditors' Claim was to be paid $40.57, with the remainder of the Senior Secured claim discharged and the parties executing releases.

For the Co-Investors' Claim in the amount of $221,000,000, they were to be paid $2,500,000, with the balance of the obligation being discharged and the parties executing releases.[41]

Under the Joint Plan the creditors holding $850,000 to $900,000 in general unsecured claims were paid in full.

The Disclosure Statement provides information about the pre- and post-petition operation of the Property by the Debtor and the Bankruptcy Estate. This included a discussion of the dispute with California Federal Bank and commencing the Wilshire Bankruptcy Case to prevent the Senior Secured Creditors from proceeding with a foreclosure sale. It further discussed the active prosecution of the case by the Debtor and the Secured Creditors, including an attempt to have a bankruptcy trustee appointed. The final approved disclosure statement was forged from drafts advanced by the Debtor and objections asserted by the U.S. Trustee, Secured Creditors, and California Federal Bank. During the Wilshire Bankruptcy Case the creditors who chose to be active conducted discovery, investigated the operation of the Debtor's business, evaluated competing claims, and participated in advancing a chapter 11 plan. By early October 1997, Debtor, Secured Creditors, and Co-Investors entered into a Memorandum of Understanding which was the foundation for the Joint Plan. Ultimately, the parties in the Wilshire Bankruptcy Case structured

_____

[41] Ex. 21; Disclosure Statement 491-492. Ex. 21; Plan Art. VII A. and C., pp. 545, 546.

-38-

the Joint Plan and moved forward to implement the Transaction through confirmation of the Joint Plan.[42]

The uncontested evidence presented shows that this was not only a highly complex real estate partnership bankruptcy case, but one in which the various parties (Debtor, competing creditors with secured claims, third-party lessee – all natural enemies) acted in their own economic self-interests. This is not a case in which the only active parties were the debtor and insider creditors constructing a reorganization based on personal tax issues, not business economic realities.

The evidence presented shows that the Joint Plan was created by the Debtor, BofA, Senior Secured Creditors, Co-Investors holding the Junior Secured claim, California Federal Bank, and creditors holding general unsecured claims based on the economic realities of the assets and claims, not as a tax avoidance plan. This is a case where the Debtor had limited assets and extensive debts which far outstripped the assets. The creditors and Debtor fashioned a plan which made the economic results for creditors, even those holding general unsecured claims, dramatically better. To the extent that the Partners considered the tax consequences of the Transaction, such consideration did not drive the economic realities decision of the creditors in supporting the Joint Plan.[43]

---

[42] Ex. 21: Disclosure Statement, pp. 483-487.

[43] It should not be forgotten that in the chapter 11 process the creditors not only vote to accept or reject a plan, but creditors are not dependent on a "take it or leave it" plan put forward by the debtor. Creditors may advance their own chapter 11 plan to compete in the bankruptcy marketplace for creditor votes. 11 U.S.C. §§ 1121(c), 1129(a)(7) and (b).

-39-

There was no conflicting evidence presented to the court, only arguments about the legal conclusions to be drawn from the evidence. The bankruptcy court did not err in concluding that the Joint Plan was based on the economic realities of the Transaction, that the Transaction was not a sale, and that the Transaction was not shaped by tax-avoidance features or purpose.

The bankruptcy court's determination that the Transaction was a restructure of the Debtor and not a sale is affirmed.

**THE FORGIVENESS OF DEBT THROUGH THE JOINT PLAN DOES NOT RESULT IN REPORTABLE INCOME FOR FEDERAL AND STATE TAXES FOR THE PARTNERS**

Having concluded that the Joint Plan and Transaction were not a disguised sale or other than the reorganization and restructure of the Debtor as stated in the Joint Plan, the bankruptcy court further determined that the discharge or forgiveness of debt through that Joint Plan was not income to the partnership.

It has long been recognized that providing deductions or exclusions for income arising from cancellation or discharge of indebtedness through a bankruptcy case was a necessary and integral part of the bankruptcy laws. Claridge Apartments Co. v. Commm'r, 323 U.S. 141, 149 (1944)(discussing the Chandler Act provisions to encourage the freer use of bankruptcy reorganization and avoid otherwise unnecessary or premature liquidations).

The term "gross income," from which a tax calculation begins, is defined in IRC § 61. This non-exclusive list "means all income from whatever source derived." Some statutory examples [identified by numbering used in the statute] are (1) compensation for services, (2) gross income from business, (3) gains from dealings in property, (8) alimony, and (12) income from discharge

-40-

of indebtedness. In 2925 Briarpark, Ltd. v. Comm'r, 163 F.3d 313 (5th Cir. 1993), the Fifth Circuit Court of Appeals reviewed a decision of the United States Tax Court concerning a sale of property by a partnership. In Briarpark, the partnership sold property subject to $24,562,763 in liens for $10,936,532. As part of the sale, the creditor released Briarpark and the guarantor (who was insolvent) of approximately $14,000,000 of liability in excess of the sales proceeds paid to the creditor. On its tax return, Briarpark reported $14,468,154 of cancellation of indebtedness income relating to the sale.

The Fifth Circuit noted that gross income pursuant to IRC § 61 comes in many forms, with two of the examples being "gains derived in dealing in property" (IRC § 61(a)(3)) and "income from discharge of indebtedness" (IRC § 61(a)(12)). Because the practical effect of the Briarpark transaction was to sell the property to a buyer, then the purchase price paid and the debt forgiveness were determined by the Tax Court (the trial court) to be part of a single transaction for income defined as "from a sale or exchange" of property. In closing, the Fifth Circuit emphasized that it is for the trial court, upon consideration of the entire transaction, to determine the factual category (dealing in property or cancellation of indebtedness) of the income for taxation purposes.[44]

The Transaction which occurred in this case is the reorganization of Debtor into Wilshire LLC. The bankruptcy court determined that the reorganization was not a sale or transfer of

---

[44] Id. at 318.

-41-

property. As part of the reorganization, the former interests of the Partners were cancelled and a creditor obtained a 99% interest in Wilshire LLC for a portion of its secured claim. The confirmation of the Joint Plan included forgiveness of the indebtedness, as part of a complex restructuring of the Debtor and creditors' rights and interest.

After considering the evidence presented, the bankruptcy court determined that the forgiveness of debt through the Joint Plan constituted cancellation of debt income, not capital gain.[45] Upon de novo review, this Panel makes the same determination. The Transaction and restructuring of the complex rights and interests of the bankruptcy estate, Senior Secured Creditors, Co-Investors, creditors holding general unsecured claims, and Partners, resolving lease disputes, and creating the new successor Wilshire LLC, is consistent with the forgiveness of debt, not with a sale of the Property.

Merely because the restructuring of the Debtor, the emergence of the successor entity, the forgiveness of indebtedness, the New Refinance Loan, and issuance of the interests in the reorganized debtor all occur in one document, the Chapter 11 Plan, that does not mean that it is just one big sale transaction. In every bankruptcy case, the confirmation of the Chapter 11 plan fixes the rights and interests, provides for the forgiveness of indebtedness, and binds the parties (11 U.S.C. § 1141) in one fell swoop.

The Joint Plan provides for the forgiveness of indebtedness

---

[45] Ex. 40; August 31 Decision, p. 1507.

as one of multiple plan provisions.  Some creditors forgave substantial amounts for the payment of a modest amount (recovering "only" $2,500,000 on a $212,000,000 claim, rather than getting nothing), while the Senior Secured Creditors forgave indebtedness and contributed $23,000,000 to the reorganized Debtor.  As part of this complex Transaction, the Senior Secured Creditors acquired 99% of the interest in Wilshire LLC.

As noted by the Ninth Circuit Court of Appeals in Wilshire I, bankruptcy plans are often dependent on the cancellation of indebtedness relief in bankruptcy to facilitate a reorganization. A reorganization produces better economic results for all and preserves a business operation, rather than merely shutting everything down and liquidating the pieces.  Such a reorganization often, as in the Wilshire Bankruptcy Case, is a complex reordering of rights and interests, forgiving debt, incurring new obligations, making capital contributions, and deferring payment. This is much more complex than - "sell the property and pay the money."

The evidence presented to the bankruptcy court, for which there were no material facts in dispute, supports the determination that the Transaction resulted in the forgiveness of debt and "cancellation of debt income," not "gains from dealings in property."

### The Bankruptcy Code And Internal Revenue Code Provide For No Realization of Income From Forgiveness Of Indebtedness In A Bankruptcy Case

To facilitate reorganizations under the Bankruptcy Code rather than forcing liquidations of business and financial enterprises, Congress has provided for special tax treatment when

-43-

indebtedness is discharged or forgiven through a bankruptcy case. In this appeal, the provisions of 11 U.S.C. § 346(a) and (j) as they existed in 1998 are at issue.

§ 346. Special tax provisions

(a) Except to the extent otherwise provided in this section, subsections (b), (c), (d), (e), (g), (h), (i), and (j) of this section apply notwithstanding any State or local law imposing a tax, but subject to the Internal Revenue Code of 1986.
. . .

(j)(1) Except as otherwise provided in this subsection, income is not realized by the estate, the debtor, or a successor to the debtor by reason of forgiveness or discharge of indebtedness in a case under this title. . . .

In addition to § 346, the Internal Revenue Code itself has a specific section addressing income generated from the discharge of indebtedness. In pertinent part, IRC § 108 provides:

§ 108. Income from discharge of indebtedness

(a) Exclusion from gross income.

(1) In general. Gross income does not include any amount which (but for this subsection) would be includible in gross income by reason of the discharge (in whole or in part) of indebtedness of the taxpayer if-

(A) the discharge occurs in a title 11 case, . . .

(2) Coordination of exclusions.

(A) Title 11 exclusion takes precedence. Subparagraphs (B), (C), and (D) of paragraph (1) shall not apply to a discharge which occurs in a title 11 case. . . .

The Debtor that was reorganized into Wilshire LLC was a partnership. While the tax liabilities and attributes for a partnership are passed through to the partners, the income or loss (tax attributes) are first determined at the partnership, and then

-44-

those attributes are passed through to the partners.

The plain language of 11 U.S.C. § 346(j) states, "income is not realized by the estate, the debtor, or a successor to the debtor by reason of forgiveness or discharge of indebtedness in a case under [Title 11]." IRC § 108 confirms that if a discharge of indebtedness occurs in a case under Title 11, then that basis for such discharge shall control over all others. By Confirmation of the Joint Plan in the Wilshire Bankruptcy Case, Debtor was forgiven debt of $40,570,000 of the Secured Creditors' Claim and $218,500,000 of the Co-Investor's Claim.[46]

No income is realized by either the bankruptcy estate or Debtor for such forgiveness of indebtedness. Properly applying the provisions of 11 U.S.C. § 346(j) and IRC 108(a), the Debtor, bankruptcy estate, and Wilshire LLC did not obtain income from the forgiveness of debt. There being no income for the Debtor, there is no income to pass through to the Partners by virtue of the forgiveness of indebtedness in the Wilshire Bankruptcy Case under Title 11. It may well be that there are other adjustments of tax attributes (IRC § 108(b)) or partnership basis (IRC § 705), but the determination of whether there is income or loss is computed at the partnership, not the individual partners.[47]

The determination by the bankruptcy court that discharge or

---

[46] Ex. 21; Disclosure Statement Classes C-1 and C-2, p. 492. Ex. 21; Joint Plan Classes C-1 and C-2, p. 537, and Article VII Discharge and Release, pp. 545-546.

[47] IRC § 704 provides that a partner's share of income, gain, loss, deductions, or creditors (once determined for the partnership) are distributed among the partners pursuant to the partnership agreement.

forgiveness of indebtedness exclusion from income applies to the Debtor and results in there not being income from discharge of indebtedness for the Partners is affirmed.

**CONCLUSION**

We **REVERSE** the bankruptcy court's determination that the Confirmation Order itself was a determination whether the Transaction was a sale or not a sale of property.

We **AFFIRM**, upon de novo review, the bankruptcy court's entry of summary judgment in favor of Wilshire LLC and the Partners. In so affirming, this Panel determines: (1) Wilshire LLC has standing to file and prosecute the OSC; (2) CFTB received sufficient notice for the Confirmation Order to be binding on CFTB; (3) the proper appeal is taken from the Summary Judgment Order filed on October 4, 2010; (4) the Transaction, based upon the economic realities of the Transaction, was not motivated by tax avoidance; (5) the Transaction was not a sale, but provided for the forgiveness of debt owed by the Debtor; (6) the forgiveness of debt through the Joint Plan was subject to the provisions of 11 U.S.C. § 346 (in effect as of the confirmation of the Joint Plan) and 26 U.S.C. § 108; (7) the tax consequences of the Transaction are determined at the Debtor, the partnership, and such tax consequences are then passed through to the Partners; and (8) the forgiveness of debt did not result in income realized by the Debtor or passed through to the Partners.